AARON H. COLEMAN, PLAINTIFF-APPELLANT, v. NEWARK MORNING LEDGER CO., A CORPORATION OF NEW JERSEY, SAMUEL I. NEWHOUSE, PHILIP HOCHSTEIN, W. E. BOWMAN, PAUL TIERNEY AND EDWARD WALSH, DEFENDANTS-RESPONDENTS.

Argued December 16, 1958—Decided March 9, 1959.

360

*Mr. Harry Green* argued the cause for appellant (*Mr. Richard F. Green,* attorney).

*Mr. John F. Lynch* argued the cause for respondents (*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys).

The opinion of the court was delivered by

HEHER, J. In this action for libel, the jury returned a verdict for the defendants; and the case is here by our certification, *sua sponte,* of plaintiff's pending appeal from

the consequent judgment to the Appellate Division of the Superior Court.

The defendants are the Newark Morning Ledger Co., as the corporate "printer and distributor" of a daily newspaper styled the *Newark Star-Ledger,* of "wide circulation within and beyond the State of New Jersey"; Samuel I. Newhouse, "publisher" of the newspaper; Philip Hochstein, "editor"; W. E. Bowman, "assistant publisher"; Paul Tierney, "executive editor"; and Edward Walsh, "staff writer."

The complaint is in two counts. The first charges that on October 23, 1953 the "several defendants acting in concert" published an edition of the *Newark Star-Ledger* in which this "false and malicious" statement was made of and concerning the plaintiff, Aaron H. Coleman:

"EX-MARINE LINKED TO ROSENBERG
Monmouth radar aide was spy's roommate
McCarthy presses for espionage trial
 FORT MONMOUTH—An ex-Marine officer, suspended from his job at the Fort Monmouth radar laboratories in 1949 after Military Intelligence found 43 classified documents in his apartment, may have been the direct link between the laboratories and the Rosenberg spy ring, Sen. McCarthy said yesterday.
 McCarthy said the man at one time roomed with Julius Rosenberg, the executed atom spy, and has admitted that several other known Communists had keys and free access to his apartment during the time the classified material was there.
 The senator added he has conferred unofficially with Justice Department officials and they have decided the man can be brought to trial under the espionage act.
&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;
 The man's apartment was raided by Military Intelligence in 1946, McCarthy said, and 43 classified documents were found."

It is pleaded that the "person [therein] named as Julius Rosenberg had previously been convicted and executed as an espionage agent for Communist Russia"; and that these statements thus published are "false and libelous": (a) "Military Intelligence found 43 classified documents in [plaintiff's] apartment"; (b) "plaintiff 'may have been the direct link between the laboratories and the Rosenberg Spy Ring'"; (c) "plaintiff 'at one time roomed with Julius

Rosenberg' "; (d) "plaintiff 'admitted that several known communists had keys and free access to his apartment during the time the classified information was there' "; and (e) "plaintiff's 'apartment was raided by Military Intelligence in 1946 * * * and 43 classified documents were found' "; and "also the inference that the plaintiff Aaron H. Coleman was guilty of, or had been charged with, or indicted for, the crime of espionage."

And it is alleged that plaintiff "has been [thereby] injured in his good name, fame and credit; has suffered loss of income; was subjected to mental suffering and anguish; has been put to great expense in defending himself against the false charges brought against him; has been and will in the future be deprived of an opportunity to earn his livelihood in the fields of electronics and radar in which he is proficient; and has been subjected to public scandal, infamy and disgrace."

The second count pleads that on December 9, 1953 the defendants in concert published an edition of the same newspaper in which this statement was also "falsely and maliciously" made of and concerning the plaintiff, that is to say:

"EX-FORT AIDE FACES INDICTMENT FOR PERJURY
McCarthy giving details to grand jury
Ex-Monmouth aide [f]aces perjury count
WASHI[N]GTON—Sen. McCarthy (R.-Wis.) yesterday moved to have a suspended Fort Monmouth (N. J.) radar scientist cited for perjury after his public denials did not jibe with testimony given by executed atom spy Julius Rosenberg.
The Red hunter said he would forward yesterday's testimony of Aaron Coleman of 42 Branchport Ave., Long Branch, N. J., to a federal grand jury here for possible perjury indictments.
* * * * * * * *
Roy Cohn, counsel to the Senate investigations subcommittee, said Rosenberg's testimony while on trial for his life is in 'direct, flat contradiction' to a denial by Coleman that he knew Rosenberg at Ft. Monmouth.
McCarthy then announced a transcript of the Coleman testimony —with a 'from the grave' rebuttal by Rosenberg—will be sent to the Justice Department 'with the recommendation that it be submitted to the grand jury.'
* * * * * * * *

Cohn said Rosenberg listed among the college classmates with whom he had contact 'Mr. Aaron Coleman who, subsequent to graduation, I met at Ft. Monmouth.'

McCarthy labeled this 'testimony from the grave' and said it probably wouldn't 'be admissible in a criminal action for perjury.'

But he said he would admit it to the hearing record, which will be sent to the Justice Department. Coleman was called back for further questioning today."

And it was charged that these "statements or inferences" were "false in fact to the knowledge of the defendants, and were published by the defendants maliciously and with the intention of injuring the plaintiff," that is to say: (a) "there was then pending a perjury indictment or 'count' against the plaintiff"; (b) the "facts alleged to have been stated by Senator McCarthy would, if true, have warranted an indictment against the plaintiff for perjury"; (c) plaintiff "was or might have been guilty of the crime of perjury"; (d) plaintiff "is or was a 'Red' (meaning a Communist), or is or was a proper subject for the attention of a 'Red hunter' "; and (e) Senator McCarthy "had in fact 'moved to have (the plaintiff) cited for perjury.' "

The *ad damnum* clause is in essence much the same as in the first count.

And there were allegations in each count that plaintiff's demand for a "public retraction" of the "libelous statements, in accordance with the statute," had not been met.

The answer admits the publications in question, alleges lack of knowledge or information sufficient to form a belief as to certain averments of the complaint, denies "wide circulation [of the *Newark Star-Ledger*] beyond New Jersey" and the allegations of libel and damage, asserts want of malice "in failing to retract," and pleads, by way of separate defenses, truth and justification, privilege and fair comment, that is to say, that certain of the published words made the basis of the first count "are not libelous and do not state a claim upon which relief may be based"; that the words of both articles, separately and in context, "related to matters of public interest and concern and to the public acts of a public employee, and constituted fair comment based upon

facts which were true in substance and in fact"; that the words of the articles "related to, and constituted, a full, fair and impartial report of a legislative proceeding and were printed and published without malice and with an honest belief of their truth," and "with the intent and purpose to inform the public on matters of public interest pertaining to the welfare and safety of the United States of America."

Plaintiff observes in the brief that defendants "did not plead the defense of truth separately as to the first count"; and it is said that by the pretrial order "the issues were whether the news articles were true in substance and in fact and whether the defendants justified same according to law in their answer and proved the same as required by law; and also whether the news articles constituted fair comment."

The given news articles purport to be disclosures attending an investigation of the Army Signal Corps Laboratories at Fort Monmouth, New Jersey, by the Permanent Subcommittee on Investigations of the Committee on Government Operations of the United States Senate acting pursuant to *Senate Resolution* 40, 83*d Congress*. The article of October 23, made the subject of the first count, was testimonially verified by Senator Joseph R. McCarthy, the chairman of the subcommittee, as a fair and accurate portrayal of an authorized public report made by him at a press conference held at Fort Monmouth following an "executive session" of the subcommittee; the article of December 9, pleaded in the second count, relates what is said to have been the proceedings at an open public hearing held the prior day by the subcommittee in Washington, D. C.

It was stipulated below that "there was an official senatorial investigation conducted by one of the subcommittees of the [United States] Senate," and that "the subcommittee was acting under the authority of the Senate in conducting the Fort Monmouth investigation." And it was conceded that the "Committee on Government Operations prior to 1953 adopted a rule under which any member of the subcommittee

constituted a quorum for the purpose of administering oaths"; and it was agreed that the plaintiff would "not raise any question about the validity of the testimony taken or the status of the committee or the testimony taken with only Senator McCarthy sitting."

Senator McCarthy testified in the current proceeding that he presided at the subcommittee hearings held at Fort Monmouth and in New York City in October and November 1953, under the authority of the Senate, concerning "subversion and espionage"; and that the news article of October 23 was an "accurate report," a "very accurate report and summation" of what he "told the newsmen who were present" at the press conference held the preceding day immediately after the executive session of the subcommittee; "it said what had gone on in the session," and in so doing, he acted under the authority of the subcommittee given "in executive session of the subcommittee." The executive session, he said, "elicit[ed] information or evidence of the facts stated in that subhead," *i. e.*, "Monmouth radar aide was spy's roommate," in the news article of October 23, declared upon in the first count. There was no evidence *contra*.

## I.

As to the first count, the contention is that where, as is said to be the case here, the "publication is libelous *per se, i. e.*, as a matter of law, and the plaintiff is not named therein, but is described and identified by the defendants as the person meant, and readers so testified without dispute, and truth was not pleaded, but fair comment and qualified privilege (consisting of alleged report of a legislative proceeding) were, and it appeared that the publication was based upon a press conference of Senator McCarthy, and was not a report of a legislative proceeding," there was error in the refusal to direct judgment "for liability and compensatory damages."

As to the second count, the insistence is that the publication is also libelous *per se*, in that "the plaintiff was named

therein, and truth was pleaded in particularity, but not as broad as the charge, and defendants pleaded that publication was privileged as the report of a legislative proceeding," and the "headline was libelous *per se* and not justified by defense of truth and not a part of a report of a legislative proceeding," and plaintiff should have had judgment for "liability and compensatory damages."

It is said in argument that, as to the cause of action pleaded in the first count, defendants have not, as just said, "alleged defense of truth," and the defense of fair comment "cannot stand unless it is founded upon truth"; that there is a presumption of the falsity of defamatory words, and the law presumes damage where the words are actionable *per se;* and on the assumption of a privileged communication, it is suggested that privilege is a "special defense" to be proved, and it was not "specially set up in the answer, but as a bare conclusion under the second separate defense, and is therefore not available to the defendants," citing *Shaw v. Bender,* 90 *N. J. L.* 147 (*E. & A.* 1917); *O'Regan v. Schermerhorn,* 25 *N. J. Misc.* 1 (*Sup. Ct.* 1946).

And as to the "privileged character of statements as report of legislative proceedings," it is urged that this "is not an action for defamation against Senator McCarthy, in which the issue could arise that what he said was part of the legislative proceeding"; that a report of a judicial proceeding is only qualifiedly privileged, citing *Rogers v. Courier Post Co.,* 2 *N. J.* 393 (1949), and so "oral statements made after the regular proceeding has been concluded, or after the court has adjourned, although uttered in court room, are no part of a judicial proceeding and [are] not protected by the privilege" invoked; and that "in so far as [the] headlines are concerned, there was no privilege—they certainly constituted an excess publication," citing *King v. Patterson,* 49 *N. J. L.* 417, 421 (*E. & A.* 1887), wherein it was held that "[t]he subject may be one that is privileged, and a communication on that subject be unprivileged if the restraints and qualifications imposed by law upon the publicity to be given the communication be not observed."

Judge Coolahan submitted to the jury the question of whether the publications were "fair and accurate reports of the [pleaded] legislative committee proceedings," and the subject of a qualified privilege, actionable notwithstanding the privilege if "made with malice and without an honest belief as to the truth of the articles." The jury were instructed that "[a]ccounts of and comments on the reports of a committee of Congress or of the legislature are privileged, provided they are substantially accurate and the comments are fair and publication is made in good faith and without actual malice," but yet a "qualified privilege" which would be defeated if the publication "is not made in good faith," or there is "express malice or absence of belief in the truth thereof," or the defendants are "motivated by a desire other than to make an accurate and fair report in good faith to the public at large," an issue to be resolved by the jury, measured by the given considerations.

Defamatory words uttered in a privileged communication are not actionable unless actuated by malice. "A wrong or malicious motive is essential to the action where the communication is privileged"; in a "legal sense, malice, as an ingredient of actions for slander or libel, signifies nothing more than a wrongful act done intentionally, without just cause or excuse"; and a defamatory publication "under the pretext of a privileged communication, where the privilege does not exist, is a publication without just cause or excuse, and in a legal sense malicious and therefore actionable, though it be made without a malicious motive"; the burden of proving a privileged occasion is on the defendant, but where the occasion is privileged, it is for the plaintiff "to establish that the statements complained of were made from an indirect or improper motive, and not for a reason which would otherwise render them privileged." *King v. Patterson, supra.*

Malice cannot be defined in terms that will automatically resolve every case. "[A]ny indirect motive, other than a sense of duty, is what the law calls 'malice.'" *Dickson v. Earl of Wilton*, 1 F. & F. 419, 427, 175 *Eng. Rep.*

790, 793 (1859), Lord Campbell, C. J. In this context, "malice" is used in the ordinary and popular sense of the term. "When there has been a writing or a speaking of defamatory matter, and the judge has held—and it is for him to decide the question—that although the matter is defamatory the occasion on which it is either written or spoken is privileged, it is necessary to consider how, although the occasion is privileged, yet the defendant is not permitted to take advantage of the privilege. If the occasion is privileged it is so for some reason, and the defendant is only entitled to the protection of the privilege if he uses the occasion for that reason. He is not entitled to the protection if he uses the occasion for some indirect and wrong motive. If he uses the occasion to gratify his anger or his malice, he uses the occasion not for the reason which makes the occasion privileged, but for an indirect and wrong motive"; "malice" is the doing of a "wrong thing for some wrong motive"; it means "a wrong feeling in a man's mind"; and the moment the judge rules that the occasion is privileged, the presumption of malice is rebutted by the privilege and the burden of showing that the defendant did not act "in respect of the reason of the privilege, but for some other and indirect reason, is thrown upon the plaintiff." *Clark v. Molyneux*, 3 Q. B. D. 237, 246 (1877).

 "Malice" is implied by the law from an intentional publication of a defamatory character, even though the defendant harbored no ill will toward the plaintiff, and entertained an honest belief of the truth of what he said. *King v. Patterson, supra; Hoffman v. Trenton Times*, 17 *N. J. Misc.* 339 (*Sup. Ct.* 1939), affirmed 125 *N. J. L.* 450 (*E. & A.* 1940); *Bromage v. Prosser*, 4 *B. & C.* 247, 1 *C. & P.* 475, 673 (1825); *Hulton & Co. v. Jones*, [1909] 2 *K. B.* 44, 78 *L. J. K. B.* 937, affirmed, [1910] *A. C.* 20, 79 *L. J. K. B.* 198. But it is requisite that there be malice in fact if a qualified privilege is to be overcome. The privilege may be lost if the defendant publishes the defamation "in the wrong state of mind"; the word " 'malice,' " which has plagued the law of defamation from the beginning,

has been much used in this connection, and it frequently is said that the privilege is forfeited if the publication is 'malicious,'" meaning "something more than the fictitious 'legal malice' which is 'implied' as a disguise for strict liability in any case of unprivileged defamation"; yet "it may mean something less than spite, ill will, or a desire to do harm for its own sake," and, while there is authority to the contrary, "it is the better and perhaps more generally accepted view that the existence of such ill will does not necessarily defeat the privilege"; " 'malice' in this sense may subject the defendant to punitive damages if he is liable at all; but if the privilege is otherwise established by the occasion and a proper purpose, the addition of the fact that the defendant feels indignation and resentment toward the plaintiff and enjoys defaming him will not always forfeit it"; "[p]erhaps the statement which best fits the decided cases is that the court will look to the primary motive or purpose by which the defendant apparently is inspired"; it would seem that "the privilege is lost if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection"; if the defendant is moved "chiefly" by "motives of ill will, or to accomplish a distinct objective which may be legitimate in itself but is not within the privilege," *e. g.,* to retain a servant in employment, he is given no immunity. *Prosser on Torts* (2d ed.), 601, 627–8, citing, *inter alia, Fahr v. Hayes,* 50 *N. J. L.* 275 (*Sup. Ct.* 1888). And see *Restatement, Torts,* § 603.

## II.

A communication "made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable"; the "fundamental test is the *bona fides* of the communication," and it is not privileged when the person making it has "full knowledge

of its untruthfulness." *Lawless v. Muller,* 99 *N. J. L.* 9 (*Sup. Ct.* 1923). As to the element of good faith in relation to grounds and strength of belief, see *Doane v. Grew,* 220 *Mass.* 171, 107 *N. E.* 620, *L. R. A.* 1915C, 774 (*Sup. Jud. Ct.* 1915); *Pecue v. West,* 233 *N. Y.* 316, 135 *N. E.* 515 (*Ct. App.* 1922); *British Ry. Traffic Co. v. C. R. C. Co.,* [1922] 2 *K. B.* 260, 91 *L. J. K. B.* 824; also *Hallen,* "*Character of Belief Necessary for the Conditional Privilege in Defamation,*" 25 *Ill. Law Rev.* 865 (1931); *Restatement, Torts,* §§ 600–602.

 As said above, the defendant has at the outset the burden of establishing the existence of a privileged occasion for the publication, *Prosser, Ibid.,* 629, by proof of "a recognized public or private interest which would justify the utterance of the words"; and whether there was such privilege and the comment involved a legitimate matter of public concern are basically questions of law for the court, subject to the exercise of the jury's traditional function where the facts are in dispute. *Savage v. Stover,* 86 *N. J. L.* 478 (*Sup. Ct.* 1914), affirmed 87 *N. J. L.* 711 (*E. & A.* 1915); *Hebditch v. MacIlwaine,* [1894] 2 *Q. B.* 54, 63 *L. J. Q. B.* 587.

 The rule of conditional or qualified privilege, whereby a person is protected from legal liability for defamatory words in fact untrue, if uttered honestly and without any indirect or improper motive, is founded on the general welfare of society and so new occasions for its application will necessarily arise with continually changing conditions. *Howe v. Lees,* 11 *C. L. R.* 361, 369 (1910); *Adam v. Ward,* [1917] *A. C.* 309; *Telegraph v. Bedford,* 50 *C. L. R.* 632, 656–7 (1934). The policy is an accommodation of competing social and political interests for the good of all: the protection of the reputation of individuals, on the one hand, and on the other the collective security and the "interest of the public in the fullest freedom of officials to make disclosures on matters within the scope of their public duties * * *." *Barr v. Matteo,* 355 *U. S.* 171, 78 *S. Ct.* 204, 2 *L. Ed.* 2d 179 (1957). This, on the ground that

it is "in the public interest that persons should be allowed
to speak freely on occasions when it is their duty to speak,
and to tell all they know or believe, or on occasions when
it is necessary to speak in protection of some [self or]
common interest": and the question is whether the occasion
has been abused "by making it the opportunity of indulging
in some private spite, or for using the occasion for some
indirect purpose or under the influence of some indirect
motive"; yet " 'to submit the language of privileged com-
munications to a strict scrutiny, and to hold all excess
beyond the absolute exigency of the occasion to be evidence
of malice would in effect greatly limit, if not altogether
defeat, that protection which the law throws over privileged
communications.' " *Gerhold v. Baker*, [1918] *W. N.* 368,
Bankes, L. J., citing *Laughton v. Bishop of Sodor and Man*,
(1872) *L. R.* 4 *P. C.* 495, 508. The restraint upon freedom
of speech or writing would in its evil public consequences
outweigh the private injury. *Huntley v. Ward*, 6 *C. B.*
(*N. S.*) 514, 517 (1859), Willes, J.; *Bowen v. Hall*, 6
*Q. B. D.* 333, 343 (1881), Coleridge, C. J.

In England the occasions of such privilege include
(a) reports of parliamentary proceedings; (b) extracts from,
or abstracts of, parliamentary reports, papers, votes, or pro-
ceedings published by the authority of Parliament; and
(c) reports in a newspaper or broadcast having qualified
privilege, according to certain statutory regulations. *Gatley
on Libel and Slander* (4th ed.), 195, 287–288, 322–324.

 A defamatory publication is deemed "malicious,
unless it is fairly made by a person in the discharge of some
public or private duty, whether legal or moral, or in the
conduct of his own affairs, in matters where his interest
is concerned. In such cases, the occasion prevents the in-
ference of malice, which the law draws from unauthorized
communications, and affords a qualified defence depending
upon the absence of actual malice. If fairly warranted by
any reasonable occasion or exigency, and honestly made,
such communications are protected for the common con-
venience and welfare of society; and the law has not restricted

the right to make them within any narrow limits." *Too-good v. Spyring,* 1 *C. M. & R.* 180, 193, 149 *Eng. Rep.* 1044 (1834), Parke, B. This has been termed a "classic statement of the law of privilege." *Robb v. Morrison,* 20 *N. S. W. St. Rep.* 163, 10 *B. R. C.* 298 (1920).

The reason for holding any occasion privileged is "common convenience and welfare of society, and it is obvious that no definite line can be so drawn as to mark off with precision those occasions which are privileged, and separate them from those which are not." *Stuart v. Bell,* [1891] 2 *Q. B.* 341, 346, Lindley, L. J. There are occasions "on which a qualified privilege arises from duty or common interest, or self-defence"; and "[f]air comments on matters of public interest" are sometimes treated as a distinct class of privileged communications. *Odgers on Libel and Slander,* (*6th ed.*), 206. Reports of parliamentary proceedings are privileged at common law; every fair and accurate report of any proceeding in either House of Parliament, or in any committee thereof, is privileged, even though it contain matter defamatory of an individual. *Ibid.,* 252, 269. "An occasion is privileged when the person who makes the communication has a moral duty to make it to the person to whom he does make it, and the person who receives it has an interest in hearing it. Both these conditions must exist in order that the occasion may be privileged." *Pullman v. Hill & Co.,* [1891] 1 *Q. B.* 524, 528. And see *Watt v. Longsdon,* [1929] 1 *K. B.* 130, 69 *A. L. R.* 1005 (*C. A.*).

The Report of the Committee on the Law of Defamation presented by the Lord High Chancellor to Parliament in October 1948 did not recommend any change in the common-law rule of "qualified privilege" wherever the person publishing the defamatory statement "is under a duty to, or has an interest in, publishing it, and each person to whom it is published has a corresponding duty or interest in receiving it," a doctrine deemed of "vital everyday importance to all members of the community," and a branch of the law of defamation which had evoked little or no criticism.

Thus, the occasion is privileged if it is concerned with matters materially affecting the public interest; and the principle is *a fortiori* applicable to reports of legislative and public proceedings involving the public security. The privilege, says Dean Prosser, *Ibid.*, 623, "rests upon the idea that any member of the public, if he were present, might see for himself, and the reporter is merely a substitute for the public eye"; this "privilege of reporting extends to all legislative proceedings, including the investigations of committees and the deliberations of municipal councils, and to the acts of executive or administrative officials of the national, state or municipal governments, including their official reports and communications." But it is of the essence of the privilege that the report be fair and accurate, both as to fact and comment, and comment may itself be privileged because the "subject of the proceedings affects the public interest."

The rule given in the *Restatement, Torts,* § 611, is that the qualified privilege extends to the "proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty," although the publication contains false and defamatory matter, if it is (a) accurate and complete or a fair abridgment of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed; and it is there commented (a) that the privilege is lost "if the report is published solely for the purpose of defaming the other and not for the purpose of informing the public," and the privilege "differs from the usual conditional privilege in that it affords protection even though the defamatory statement reported is known to be false."

In this, as was said in *Leers v. Green,* 24 *N. J.* 239, 254 (1957), "we have the very essence of the freedom of speech and of press secured by the 1947 *State Constitution, Article* I, *paragraph* 6, holding the actor 'responsible for the abuse of that right,' (derived from the 1844 *Constitution, Article* I, *paragraph* 5) and also by the First Amendment

to the Federal Constitution." The "instruments of communication, such as the newspaper, are themselves privileged to aid in the publication, wherever the privilege in fact exists." *Prosser*, 626.

We are not concerned here with the absolute privilege to publish defamatory matter without regard to purpose or motive or the reasonableness of the act, but rather the privilege which conditions immunity upon the absence of the indirect or improper motive which constitutes actual malice, an inquiry of fact which is peculiarly the province of the jury. See *Restatement, Torts*, §§ 618, 619. And it is not requisite to privilege that the act done be within the scope of official authority; it is enough if it be done by "an officer *'in relation* to matters committed by law to his control or supervision,'" or that it have "*'more or less connection with* the general matters committed by law to his control or supervision.'" *Glass v. Ickes, 73 App. D. C. 3, 117 F. 2d 273, 278 (D. C. Cir. 1940)*, holding a press release absolutely privileged, citing *Spalding v. Vilas, 161 U. S. 483, 16 S. Ct. 631, 40 L. Ed. 780 (1895)*; *Cooper v. O'Connor, 69 App. D. C. 100, 99 F. 2d 135, 118 A. L. R. 1440 (D. C. Cir. 1938)*. And see *Barr v. Matteo, 103 U. S. App. D. C. 176, 256 F. 2d 890 (D. C. Cir. 1958)*, also *Barr v. Matteo, 355 U. S. 171, 78 S. Ct. 204, 2 L. Ed. 2d 179 (1957)*, distinguishing between absolute and qualified privilege immunizing defamation uttered by an officer of the Government in the form of a press release relating to matters committed to his control or supervision; · also *Chatterton v. Secretary of State for India*, [1895] 2 *Q. B.* 189, Lord Esher, M. R.; *Mellon v. Brewer, 57 App. D. C. 126, 18 F. 2d 168, 53 A. L. R. 1519 (D. C. Cir. 1927)*, *certiorari* denied *275 U. S. 530, 48 S. Ct. 28, 72 L. Ed. 409 (1927)*; *Tilles v. Pulitzer Pub. Co., 241 Mo. 609, 145 S. W. 1143 (Sup. Ct. 1912)*; *Matson v. Margiotti, 371 Pa. 188, 88 A. 2d 892 (Sup. Ct. 1952)*; *Montgomery v. City of Philadelphia, 392 Pa. 178, 140 A. 2d 100 (Sup. Ct. 1958)*; also 69 *Harvard L. R.*, at *p.* 928.

■ It cannot be that evidence adduced and information acquired in the course of an executive session of a Congressional investigating committee are sealed against public disclosure for all time save as unprivileged communications subjecting the members of the committee to the risk of suit and personal civil liability for libel and slander and the like, even though the publications are made in what the committee conceived to be the interest of internal security and defense or other public exigency or matter of legitimate common concern. The collective interest then overrides the risk of harm to individual reputation, as a basic tenet of the social order. The converse of this would plainly subvert the imperative principle and policy of privilege in the service of the essential public welfare. Executive or closed sessions are ofttimes indispensable to the due prosecution of such inquiries, in the interest of the common safety; but this does not preclude the publication of such information as the committee may in its discretion deem fit and proper for the general good; and when the judicial process is invoked, it is for the jury to say whether the privilege was abused, unless there be an absolute privilege in the circumstances irrespective of malice.

■ Here, the evidence of a committee-authorized publication stood uncontradicted; and even if the proofs be open to contradictory interpretations in this regard, then the issue was within the exclusive province of the jury.

### III.

■ And it is a good defense to an action for defamation that the words used are but fair comment on a matter of public interest or concern. Fair comment is not libelous at all and requires no justification. Fair and *bona fide* comment and criticism upon matters of public concern is not libel, and the words are not defamatory. The freedom of the journalist is in essence an ordinary part of the freedom of the subject, "and to whatever length the subject in general may go, so also may the journalist, but, apart from statute

law, his privilege is no other and no higher." *Leers v. Green, supra.* And in England, too, "fair comment" is basic to the "fundamental rights of free speech and writing which are so dear to the British nation, and it is of vital importance to the rule of law on which we depend for our personal freedom." *Lyon v. Daily Telegraph,* [1943] 1 *K. B.* 746, 753, Scott, L. J.

"Fact" and "fair comment" are ofttimes not readily distinguishable. The derogatory inference may become a statement of fact rather than comment, for failure to specify the facts from which the inference is derived. The inquiry is whether, as said in *Leers v. Green, supra,* "there is a sufficient *substratum* of fact stated or indicated in the words which are the subject-matter of the action, * * *." *Kemsley v. Foot,* [1952] *A. C.* 345. Lord Porter there said that the facts necessary to justify comment might be implied from the terms of the impugned article, and the relevant questions were whether (a) the subject matter was indicated with sufficient clarity to justify comment being made, and (b) the comment actually made was such as an honest, though prejudiced, man might make. And it is for the judge to decide whether a communication is capable of a defamatory meaning and also whether the matter commented on is one of public concern; and, while it is for the jury to decide, under appropriate instructions, whether the words are allegations of fact or expressions of opinion, and, if expressions of opinion, whether such expressions of opinion are fair comment or not, in every case it is first of all the duty of the judge to determine whether there is any evidence of unfairness to go to the jury. *Leers v, Green, supra.*

As in that case, the subject matter here is one of public concern, indisputably so, involving as it does the people's "right to know" of matters substantially related to the national security and defense; and it was plainly for the jury to resolve the basic issues of truth and justification, a just use of the privilege, and fair comment, as thus defined. *Mosler v. Whelan,* 28 *N. J.* 397 (1958); *Leers v. Green,*

*supra; Gatley on Libel and Slander* (*4th ed.*), 124. And see *Odgers on Libel and Slander* (*6th ed.*), 93, 96, citing *Cox v. Lee, L. R.* 4 *Ex.* 284, 288 (1869), Kelly, C. B.

To say, as does the plaintiff, that the "headline" of the article made the subject of the second count "was libelous *per se,*" and so called for a directed "judgment for liability and compensatory damages," is to beg the question. The occasion being privileged, defamatory words are not actionable unless motivated by express or actual malice; and malice was essentially a question for the jury, the plaintiff bearing the onus of proof. The jury could have found, as it no doubt did find, that the communication was honestly made in the pursuit of what was reasonably conceived to be a public responsibility, an exercise of the basic right of freedom of speech and of press. Compare *Julian v. American Business Consultants, Inc.,* 2 *N. Y.* 2d 1, 155 *N. Y. S.* 2d 1, 137 *N. E.* 2d 1 (*Ct. App.* 1956). And, as noted above, fair comment on matters of public interest is sometimes treated as a distinct class of privileged communications; fair and *bona fide* comment and criticism upon matters of public concern is not defamatory in the legal sense, and the quality of the utterance in this regard ordinarily involves factual connotations within the province of the jury, and such is the case here. The headlines cannot be said to be unfair reporting *per se*—an abuse of the privilege as a matter of law. They were in accordance with the contemplated action announced by Senator McCarthy at the Washington hearing of December 8, that is to say, that the "suspended [plaintiff] radar scientist" would be "cited for perjury" in the particulars reported in the news article of the following day, and he "would forward [plaintiff's] testimony" given at that hearing "to a federal grand jury here for possible perjury indictments." Excessiveness of publication as a matter of law is not evident.

In January 1952, some 18 months before the publication of the first article, plaintiff was deprived of the "secret clearance" requisite for the holding of his authority as Chief of the Systems Section of Evans Signal Laboratories

at Belmar, New Jersey, and was "transferred temporarily to another agency"; on September 28, 1953, a month before the first publication, he was suspended, it is conceded in the complaint, "as an alleged security risk," and "investigation, consideration and determination of said charges was pending on October 23, 1953 and on December 9, 1953"; and on May 14, 1954, subsequent to the publication of the articles but before trial, he was dismissed from his position on a finding by the Security Review Board that his continued employment at Fort Monmouth "would not be clearly consistent with the interests of national security under the provisions of Executive Order No. 10,450," the subject of a pending appeal when the trial of the action was had which later resulted in a remand of the cause for procedural fault, of which more anon.

And we are now brought to related rulings on evidence involving the tendered exhibits marked, P–9 and P–10, and disposition of a pending preargument motion made by plaintiff.

## IV.

Considered in the context of the foregoing principles, the plaintiff was not prejudiced by any of the challenged rulings on evidence nor by the refusal to charge certain of his requests.

▰ (a) As to the exhibits, P–9 was a purely self-serving reply by plaintiff, "solely for the record," to a letter received from his commanding officer on October 21, 1946 "reprimanding" him "for carelessness in the custodianship of classified documents"; and P–10 purports to be the commanding officer's acknowledgment, also "solely for the record," not testimonially verified by him. The materiality of these documents to the issues raised here is not evident. The admission into evidence of Exhibit P–8, at plaintiff's instance, did not in itself render Exhibits P–9 and P–10 competent. At all events, in the light of the questions submitted to the jury, we are clear that an inference of harm is not sustainable.

▰ (b) The remaining questions relating to evidence are also wanting in merit; and the requests to charge were

either insufficient in law, measured by the foregoing rules, or were charged in essence.

(c) And in this context, there is no substance to plaintiff's motion, M–84, for leave to "supplement the record" by the introduction of documents concerned with his "declassification, suspension and dismissal from his employment as a radar expert at Fort Monmouth," that is to say, (1) a letter to plaintiff from the Office of the Secretary of the Army dated May 23, 1958, advising him that "it was concluded that a favorable determination should be made on all of the charges" set forth in a notice given September 23, 1958, except the "report" that in 1946, while employed at the Evans Signal Laboratory, "48 classified documents were found in [his] home and that on two other occasions during 1946, [he] attempted to violate security regulations by removing papers or bringing papers into the Evans Signal Laboratory without proper authorization," and that "In arriving at a decision upon this charge it was necessary to consider only the evidence set forth in the transcript of the hearing, which took place on 5 January 1954," and "Accordingly, it is determined that your employment at Fort Monmouth still would not be clearly consistent with the interests of national security * * *," a decision "not determinative of your eligibility for other employment, or for access to security material in other capacities"; and (2) a certified copy of an order of the United States District Court for the District of Columbia reinstating plaintiff "to his former position if it is available, or to a position of like grade, seniority, status and pay" entered October 17, 1958 pursuant to the mandate of the Circuit Court of Appeals for the District of Columbia, *Coleman v. Brucker,* 103 *U. S. App. D. C.* 283, 257 *F.* 2d 661 (1958), reversing the summary judgment dismissing the complaint of plaintiff and the several complaints of five other discharged employees of the Department of the Army on the ground that they had not been given due notice of the findings of the Security Hearing Board, and remanding the cause for further proceedings according to the opinion.

Thus, the "declassification" was not set aside; plaintiff was reinstated to his "former position" which is described by the defendants here, without challenge, as " 'correspondence work' of unclassified character."

The "original jurisdiction" of this court under the 1947 *State Constitution, Art.* VI, *Sec.* V, *par.* 3, is invoked. But here there was a trial by jury and judgment upon the verdict. And the documents are not offered to cure a "technical error or omission" of some matter capable of proof by record or other incontrovertible evidence "in aid of affirmance," and thereby to avoid a reversal for failure of proof of some "obvious fact" at the trial, as *e. g.*, in *Vailsburg Amusement Co. v. Criterion Investment Co.*, 108 *N. J. L.* 442 (*Sup. Ct.* 1932). But whatever may be done in other circumstances under the constitutional power, these documents are not relevant and material to the inquiry as to the legal sufficiency of the judgment under review; indeed, they are not conclusive of the issue of "declassification." The reversal of the dismissal of plaintiff's complaint for reinstatement was based upon a procedural deficiency, not the merits of the issue. And the letter of the Department of the Army worked no significant change in plaintiff's status as to violations of security regulations in his handling of the classified documents. The offer of these records is defended as a "discretionary" measure to counteract the "prejudicial effect" of "repeated references" at the trial to plaintiff's "declassification, suspension and dismissal" as stated *supra*. But the evidence in this regard was certainly admissible on the issue of damages allegedly attributable to the pleaded libel.

Affirmed.

WEINTRAUB, C. J. (dissenting in part). I agree with the result reached with respect to the second count, but dissent as to the first count for two reasons: (1) there is no privilege to report a secret proceeding, and (2) the imputation of corruption or crime is beyond "fair comment."

The Constitution of the United States provides an absolute privilege for members of the Congress with respect to "any

Speech or Debate in either House." *Art.* I, § 6. The immunity extends to committee proceedings. *Tenney v. Brandhove,* 341 *U. S.* 367, 71 *S. Ct.* 783, 95 *L. Ed.* 1019 (1951). Our State Constitution of 1844 contained language equivalent to the federal provision, *Art.* IV, § 4, *par.* 8, and the Constitution of 1947 expressly extends the immunity to "any meeting of a legislative committee." *Art.* IV, § 4, *par.* 9.

I do not understand the majority to find an absolute privilege beyond the precincts of the House and committee room. Such expressions as exist deny the privilege beyond those premises. *Long v. Ansell,* 63 *App. D. C.* 68, 69 *F. 2d* 386, 94 *A. L. R.* 1466 (*D. C. Ct. App.* 1934), affirmed on other grounds, 293 *U. S.* 76, 55 *S. Ct.* 21, 79 *L. Ed.* 208 (1934); *Coffin v. Coffin,* 4 *Mass.* 1, 3 *Am. Dec.* 189 (*Sup. Jud. Ct.* 1808); The *King v. Creevy,* 1 *M. & S.* 273, 105 *Eng. Rep.* 102 (*K. B.* 1813). The soundness of that proposition appears to have been assumed in *Cole v. Richards,* 108 *N. J. L.* 356 (*E. & A.* 1932). The reason for the immunity, to assure courageous and unfettered attention to the business of the legislative branch, is fully served by an immunity thus localized, and I see no need to expand it. With respect to the parallel immunity in judicial proceedings, we have denied a privilege to report the remarks of a prosecutor made other than in the course of such proceedings. *Rogers v. Courier Post Co.,* 2 *N. J.* 393, 402 (1949).

The statements by Senator McCarthy were made at a press conference after the close of a secret session of the subcommittee. I understand the majority find he had a qualified privilege to relate what had happened behind closed doors. I will assume his course was authorized by the committee, notwithstanding the vagueness of the Senator's testimony in that regard. Nonetheless, no statute, state or federal, purports to confer an immunity in those circumstances. If the privilege exists, it must be founded upon case law. I know of no decision carving such an exception from the general liability to respond for defamation, and although I do not question the judicial power to innovate the privilege, I find no justification for it.

The fact that the session was secret is, in my view, sufficient to deny a privilege. See *Danziger v. Hearst Corporation,* 304 *N. Y.* 244, 107 *N. E.* 2d 62 (*Ct. App.* 1952). The rationale of the privilege of the press to report is that the members of the public could have acquired the same information by personal attendance. The secret nature of the hearing negates the reason for the privilege. Moreover, the essential qualification of the privilege is that the report be accurate and complete or a fair abridgment of the proceedings. There is no way to measure a report against this standard when the proceedings are secret. The testimony in this case demonstrates the vice of a privilege in these circumstances. The Senator stated that plaintiff had been a roommate of Rosenberg. That factual assertion was concededly false, but efforts to discover whether any such testimony was offered at the secret hearing were fruitless for want of access to the record itself. I can see no public interest in permitting individual legislators so to speak without any opportunity for the victim to get beneath the legislator's assertion of what the record contains. The privilege which the majority opinion establishes is, in my view, an invitation to irresponsibility. If the House or a committee acting within its authority should conclude the public interest would be served by a disclosure of the proceedings of a secret hearing, the appropriate action would be to open the record to the public. I see no need, and hence no warrant, for the unfair and unreasonable course here pursued.

Hence I believe the Senator had no privilege of any kind. It follows, of course, that defendant cannot claim a privilege to disseminate his unprivileged statement. I note in passing that *N. J. S.* 2A:43–1 extends to the press a qualified privilege to report "official statements issued by police department heads, county prosecutors and coroners in investigations in progress or completed by them." The statute has been tightly construed, *Rogers v. Courier Post Co., supra* (2 *N. J.* 393), and is an inroad upon the rule of liability which neither the state nor federal Legislature has seen fit to extend to press reports of the statements of their members.

The second reason a qualified privilege is not here available is that the concept would not justify two statements in the report.

The first is the assertion that plaintiff (the jury could find the report was understood to relate to him) "may have been the direct link between the laboratories and the Rosenberg spy ring." For the reason already given, it is impossible to tell whether Senator McCarthy was here relating someone's opinion as spread on the secret record or whether, as seems more likely from the context, it was his own observation at the time of the press conference. But since the burden was defendant's to demonstrate the former in order to rely upon a right to report something absolutely privileged and that burden was not met, the question is whether the quoted portion can be justified on the basis of a qualified privilege in either the Senator or in defendant to comment upon facts truthfully stated. The issue, as submitted to the jury, was whether the quoted statement was "fair comment." It seems to me that as a matter of law it was not.

In speaking of the privilege to report judicial proceedings, a unanimous court correctly said in *Rogers, supra* (2 *N. J.,* at *page* 402) :

"* * * However, the protection of this privilege does not extend to report of defamatory statements not made in the actual course of a judicial proceeding, *and the report must not contain defamatory observations and comments from any quarter whatsoever, in addition to what forms properly the legal proceeding.*" (Emphasis added)

Fair comment means criticism. Criticism may be intense and even dispute a public official's capacity for office on the basis of the facts revealed. But the imputation of a corrupt motive or, in any event, of the commission of crime is not criticism; it is vilification. It is itself defamatory, and the sole defense is truth of the charge made. One may dissect a judge's opinion and call it inane or absurd, but he may not add that it was or could have been the product of bribery. There is no license in anyone to broadcast an accusation that one, not yet convicted, is guilty of crime, and absent

an absolute privilege, the defamer cannot insulate himself from liability by casting the charge in terms of a statement of opinion or belief.

The weight of authority holds that the imputation of a corrupt motive is not within permissible comment. *Prosser, Torts* (2d ed. 1955), § 95, *p.* 622; 33 *Am. Jur., Libel and Slander,* § 163, *p.* 156; Annotation, 110 *A. L. R.* 412, 416 (1937). I think that rule is correct, for motive is itself a fact, and hence the issue should be whether that motive in fact existed. The English view is that imputation of such motive may be fair comment if it is warranted by the facts, *i. e.,* if a fair-minded man might reasonably draw that inference from the facts stated. *Gatley, Libel and Slander* (4th ed. 1953), *p.* 350. It is not necessary for present purposes to discuss the decisions in our State, *Leers v. Green,* 24 *N. J.* 239, 254 (1957); *Dressler v. Mayer,* 22 *N. J. Super.* 129 (*App. Div.* 1952); *Merrey v. Guardian Printing & Publishing Co.,* 79 *N. J. L.* 177 (*Sup. Ct.* 1909), affirmed 81 *N. J. L.* 632 (*E. & A.* 1911), since the article here goes beyond the imputation of a corrupt motive and charges the commission of crime. 33 *Am. Jur., Libel and Slander,* § 167, *p.* 161. The charge asserts factual matters nowhere in the proof, *i. e.,* that plaintiff was a member of a detestable conspiracy and fed secret information to a foreign power.

It is of no moment that the language used was that plaintiff "may be" the treacherous link rather than that he "is." In terms of hurt, the capacity to destroy reputation is equally evident. In terms of morality, it is even less defensible to broadcast a mere possibility of criminal involvement. Suspicions should be confined to the inner sanctum of officialdom; they do not belong in the channels of mass communication. I see no alternative to the proposition that truth alone can constitute a defense to a charge so phrased. The difference between "may be" and "is," if material at all, relates to the measurement of the amount of injury inflicted, rather than to liability to respond.

The further statement which I find beyond any privilege is the following:

"The Senator added he has conferred unofficially with Justice Department officials and they have decided the man can be brought to trial under the espionage act."

The form of the statement indicates that it was added by the Senator at the press conference rather than a report of what appears in the secret record. At any rate, for the reasons already stated, it may not be deemed to be within the absolute privilege of the floor. If a privilege can be found, the source must be other circumstances. I think it clear that the undisclosed officials of the Department of Justice were not privileged by virtue of their office to broadcast to the general public their opinion of the guilt of an individual. *Rogers v. Courier Post Co., supra* (2 *N. J.* 393); *Kelley v. Hearst Corporation,* 157 *N. Y. S.* 2d 498 (*3d Dept.* 1956); *Morgan v. Bulletin Co.,* 369 *Pa.* 349, 85 *A. 2d* 869 (*Sup. Ct.* 1952); *Lancour v. Herald and Globe Ass'n,* 111 *Vt.* 371, 17 *A.* 2d 253 (*Sup. Ct.* 1941), annotated 132 *A. L. R.* 495 (1941). They may conceivably have been qualifiedly privileged to communicate their opinion to the Senator in response to an inquiry from him. We do not have the necessary facts. But a privilege upon that basis would cover only the publication to the Senator and not a republication by him or by others to whom he transmitted it.

The majority place the privilege upon the Senator's "duty" and the public's right to know. I can find neither element. It is not the duty of a Senator to investigate and prosecute violations of the law. That role is constitutionally reserved to the grand jury and members of the executive branch charged with the special mission. Nor is there any right in the public to know what the legislative branch has learned or thinks of the criminal responsibility of an individual. The proper forum is the courtroom where the process is attended by protective constitutional guaranties. It is true that the legislative hearing today in fact accomplishes such disclosure, but the disclosure of what there transpires does not rest upon either a legislative duty to expose or the public's right to such information from that source. Rather the disclosure is defensible solely as an incident to the public's

right to know what the legislators themselves are doing. No thoughtful observer of present-day legislative hearings can fail to sense the threat to our basic concepts of fairness which permeates unilateral inquiries into the behavior of specific persons. The responsibility for fair play rests solely with the legislative branch by reason of the constitutional grant of immunity from accounting elsewhere. But to extend that immunity on either an absolute or qualified basis to press conferences held by legislators, and to boot, where the hearing was and remains secret, is, in my view, a disservice to society. It being wholly unnecessary for the legislative function, the extension is a needless waste of human rights and can only serve to aggravate the already troublesome problem of trial by publication.

I would therefore reverse the judgment on the first count.

*For affirmance*—Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—5.

*For reversal in part*—Chief Justice WEINTRAUB—1.