193 N.J. Super. 12 (1984)
471 A.2d 1209
GABOR MOLNAR, 227 EAST ORANGE INC., A NEW JERSEY CORPORATION, 262 NO. GROVE STREET INC., A NEW JERSEY CORPORATION, PLAINTIFFS-RESPONDENTS,
v.
THE STAR-LEDGER, A NEW JERSEY CORPORATION, AND SCOTT MINERBROOK, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 15, 1983.
Decided February 17, 1984.
*14 Before Judges MICHELS, KING and DREIER.
Robinson, Wayne, Levin, Riccio & LaSala, attorneys for appellants (Edward F. Lamb, of counsel and on the brief).
Respondents did not file a brief.
The opinion of the court was delivered by MICHELS, P.J.A.D.
Pursuant to leave of this court defendants Newark Morning Ledger Company[1] (Star Ledger) and Scott Minerbrook (Minerbrook) appeal from a portion of an order of the Law Division that denied their motion for summary judgment in this libel action.
Plaintiff Gabor Molnar (Molnar), the sole stockholder and officer of plaintiff corporations 227 East Orange, Inc. and 262 No. Grover Street, Inc., instituted this action against the Star Ledger and its reporter Minerbrook claiming that he and his corporations were defamed by the article written by Minerbrook and published in the Star Ledger on October 17, 1980. This article, entitled "Court-Dodging Landlord Sentenced to Six Months," read as follows:
An East Orange landlord with a history of court troubles was sentenced yesterday to six months in the Essex County Corrections Center by a judge who found him guilty of noncompliance with the municipal property maintenance code.
Gabor Molnar, who has had numerous bench warrants for his arrest issued over the last two years, was taken into custody by East Orange police at his *15 Millburn home on charges he illegally shut off water on three separate occasions at two of the five properties he owns in the city, authorities said.
The arrest came after a suspicious two-alarm fire at 262 N. Grove St., which fire officials labeled a "probable arson."
While the arrest was unconnected with the blaze, fire authorities said Molnar refused to take a lie-detector test on circumstances surrounding the fire.
City Council William Eaton explained the arrest and subsequent six-month jail sentence was ordered by Municipal Judge Julius Fielo after Molnar was convicted of six property maintenance violations.
The city counsel explained Molnar was convicted earlier this year of three separate property maintenance code violations by Municipal Court Judge Kenneth Williams, but the verdict was overturned by a higher court.
Eaton said the city law department is investigating the possibility of pursuing class action suits against landlords who don't comply with property maintenance codes but who continue to collect rents.
Molnar owns four other buildings in East Orange. They are: 30 and 31 Beech St. and 165 and 227 Park Ave.
Records show Molnar has not paid taxes on any of the properties since he purchased them in 1978.
All counted, the landlord owes the city more than $170,000 in back taxes plus more than $13,500 in uncollected water bills, according to city records. [Emphasis added].
Molnar alleges that as a result of these statements he has suffered injury to his reputation and credit. The corporate plaintiffs allege as special damages that they lost tenants and revenues, that their property was disparaged on the rental market, and that their insurers cancelled the insurance on these premises. At the pretrial conference Molnar added that as a result of the article he was damaged in his occupation as a home-improvement contractor, and also that certain tenants of the buildings owned by the plaintiff corporations refused to pay rent, causing loss of revenue to the corporations and therefore loss of income to him.
During depositions Molnar virtually admitted the truth of all statements contained in the article except the portion thereof asserting that he had refused to submit to a lie detector test. Molnar admitted that he was physically present in the building on the date of the fire, but denied that he was ever requested by anyone, including the police or fire department, to take a lie detector test.
*16 Minerbrook was a "beat reporter" at the time the allegedly defamatory article was written. He testified at depositions that he first became aware of the fire at 262 North Grove Street as the result of a call which he placed to the local fire department on October 16, 1980. He first reported on the fire in an article published on that date. The article upon which this libel action is based was published on the next day, October 17th. Minerbrook testified that the information set forth in this October 17th article pertaining to Molnar's arrest and jail sentence, his earlier property maintenance code violations and his failure to pay taxes was furnished by William Eaton, the East Orange City Counsel. As to the information regarding Molnar's refusal to submit to a lie detector test, Minerbrook testified that this was obtained from a Mr. Slaughter, who Minerbrook believed was then a Deputy Fire Chief. Minerbrook admitted that after receiving this information from Slaughter he did not contact any other source, including the police or Molnar, to verify its accuracy. Minerbrook also stated that following publication of the article he was contacted by Otto Blazsek, Molnar's attorney, who informed him that Molnar had never been requested to take a lie detector test. Minerbrook further testified that after receiving this information he again contacted Slaughter who confirmed that Molnar had never been requested to undergo the test. Although Blazsek's statement was subsequently printed in an article entitled "Landlord Posts Bail" published in the Star Ledger on October 22, 1980, a formal retraction of the article published on October 17, 1980 never appeared in the Star Ledger. However, it is uncontradicted that Molnar never requested a retraction in writing from the Star Ledger.
Defendants moved for summary judgment as to all counts in the complaint on the basis that the article was not defamatory, and, alternatively, that it was privileged and that there was no proof of actual malice to overcome the privilege. They also sought dismissal of Molnar's claim for punitive damages and his claim for damages suffered by his construction company. The trial court granted partial summary judgment in defendants' *17 favor, determining that, with the exception of the statements relating to the failure to take the lie detector test, the October 17 article was not actionable. The court, however, refused to dismiss Molnar's claim for punitive damages and damages to his construction company. The trial court held essentially that the statement that Molnar refused the lie detector test, when viewed in the context of the article concerning arson, was defamatory as a matter of law, and that questions of fact existed in regard to whether the statements were privileged and as to whether the statements were made negligently or with actual malice. As to the claim for punitive damages, the trial judge found that a question of fact existed with respect to whether the article was published with malice in fact, thus precluding summary judgment on this issue. It was further determined that defendants' argument that Molnar could not sue for damages suffered by his construction corporation because the article was not "of or concerning" the corporation was without merit.

I.
The Star Ledger and Minerbrook first contend that the trial court erred in holding that the statement concerning the lie detector test when viewed "in the context of an article, concerning a suspected arson" was defamatory as a matter of law. They point out that it is common knowledge that "polygraph results may reflect nervousness rather than falsity," that such tests "have not received universal acceptance as mechanisms for ascertaining truth", and that their accuracy is open to question. They argue that the statement that Molnar refused to take the lie detector test may not be held defamatory as a matter of law. We disagree.
It is settled that the determination as to whether a statement is defamatory is a question of law to be resolved by the court. Lawrence v. Bauer Pub. & Print Ltd., 89 N.J. 451, 459 (1982); cert. den. 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d *18 395 (1982); Kotlikoff v. The Community News, 89 N.J. 62, 67 (1982); Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 429-430 (App.Div. 1958) aff'd on rehearing 49 N.J. Super. 551 (App.Div. 1958). Only where the court determines that the statement is reasonably susceptible to both a defamatory and a non-defamatory meaning does a question of fact exist for the jury to decide. Lawrence v. Bauer Pub. & Print Ltd., supra, 89 N.J. at 459; Herrmann v. Newark Morning Ledger Co., supra, 48 N.J. Super. at 431. In determining whether words are actionable, "the language in question must be construed according to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." Herrmann v. Newark Morning Ledger Co., supra, 48 N.J. Super. at 430. The allegedly defamatory statement must be taken in context and the publication considered as a whole. Cibenko v. Worth Publishers, Inc., 510 F. Supp. 761, 764 (D.N.J. 1981); Mick v. American Dental Assn., 49 N.J. Super. 262, 274 (App.Div. 1958), certif. den. 27 N.J. 74 (1958). See Kotlikoff v. The Community News, supra, 89 N.J. at 72. As stated in Lawrence v. Bauer Pub. & Print, Ltd., supra:
To establish the defamatory nature of the article it [is] not necessary for plaintiffs to prove that defendants had accused them of the commission of a crime. Words that clearly `sound to the disreputation' of an individual are defamatory on their face. [89 N.J. at 459].
Thus the fact that the article does not directly accuse Molnar of arson is of little importance. As was noted by this court in Lawrence v. Bauer Publishing & Printing Ltd., 176 N.J. Super. 378, 389 (App.Div. 1980), rev'd in part on other grounds and vacated in part on other grounds 89 N.J. 451, supra, "[t]he sting of an accusation may be more pervasive when made by insinuation."
We are satisfied that the statement that Molnar refused to take a lie detector test, when examined in the context of the reference to probable arson, is likely "to excite adverse, derogatory or unpleasant feelings or opinions" and, as such, clearly "sounds to the disreputation" of Molnar. See Lawrence v. *19 Bauer Pub. & Print, Ltd., supra, 89 N.J. at 459; Prosser, Law of Torts (4th Ed. 1977), § 111 at 739. Therefore we hold that the trial court properly concluded that the statement concerning the lie detector test was defamatory as a matter of law.

II.
The trial court erred, however, by denying summary judgment in favor of the Star Ledger and Minerbrook on the basis that there existed a genuine issue of material fact as to whether the statement was privileged. The trial court held that Minerbrook's deposition testimony was "ambiguous as the source of his information" and that an issue of fact existed as to whether Slaughter [made] the communication alleged and if so, whether it was made as a bona fide communication. In our view the statement was qualifiedly privileged, and there were no genuine issues of material fact with respect to the existence of this privilege. The October 17, 1980 article was privileged because the complained of statement was obtained from a public official acting within the scope of his duties. The qualified privilege conferred upon Minerbrook has been defined in Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375-376 (App.Div. 1959) as follows:
A communication "made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable"; the "fundamental test is the bona fides of the communication," and it is not privileged when the person making it has "full knowledge of its untruthfulness." Lawless v. Muller, 99 N.J.L. 9 (Sup.Ct. 1923).
Thus, in Barbetta Agency, Inc. v. Evening News Pub. Co., 135 N.J. Super. 214, 220 (App.Div. 1975) we noted that:
We have long recognized the existence of a qualified privilege that confers immunity upon a public official for defamation uttered in relation to matters committed by law to his control or supervision.
See also Dijkstra v. Westerink, 168 N.J. Super. 128, 135-136 (App.Div. 1979) certif. den. 81 N.J. 329 (1979); Sokolay v. Edlin, 65 N.J. Super. 112, 123-124 (App.Div. 1961).
*20 Although the communication of information to the news media may not be "specifically [d]esignated" as a duty of public officials, "it is increasingly recognized that if this communication pertains to matters which are within the scope of an official's responsibilities, such statements should be regarded as being within the `outer perimeter' of the officials' `line of duty'". Sinderbrand v. Schuster, 170 N.J. Super. 506, 509-510 (Law Div. 1979), quoting Barr v. Matteo, 360 U.S. 564, 574-575, 79 S.Ct. 1335, 1338, 1341, 3 L.Ed.2d 1434 (1959).
The qualified privilege to report defamatory words or statements uttered by a public official with respect to matters within the scope of his official responsibility is analogous to the privilege afforded the news media with respect to full, fair and accurate reports of judicial, legislative and other public proceedings. See Swede v. Passaic Daily News, 30 N.J. 320, 332-333 (1959). See also Rogers v. Courier Post Co., 2 N.J. 393 (1949); Reilly v. Gillen, 176 N.J. Super. 321 (App.Div. 1980). This privilege, often referred to as the "fair report" privilege, is set forth in the Restatement, Torts 2d, § 611 at 297 (1971), as follows:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.
Comment d to this section further indicates:
d. Official proceedings. The privilege covered in this Section extends to the report of any official proceeding, or any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions. Since the holding of an official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken. The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege.
See Coleman v. Newark Morning Ledger Co., supra, 29 N.J. at 379 (adopting the analogous rule given in the original Restatement). See also Prosser, supra, § 115 at 792, § 118 at 830-833. In Medico v. Time, Inc., 643 F.2d 134, 137-138 (3rd Cir.1981), cert. den. 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), the *21 Third Circuit Court of Appeals stated with respect to this privilege:
The fair report privilege on which the district court relied developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer. Pennsylvania had adopted the republication rule by the turn of the century, and no case brought to our attention suggests that Pennsylvania has abandoned it. With this rule, the law indulged the fiction that the republisher of a defamatory statement "adopted" the statement as his own. The common law regime created special problems for the press. When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true, a newspaper in these circumstances traditionally could avail itself of the truth defense only if the truth of the underlying defamation were established.
To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press to public accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings, the law abandons the assumption that the reporter adopts the defamatory remarks as his own. The privilege thus permits a newspaper or other press defendant to relieve itself of liability without establishing the truth of the substance of the statement reported. The fair report privilege has a somewhat more limited scope than the truth defense, however. So long as the speaker establishes the truth of his statement, he is shielded from liability, regardless of his motives; the fair report privilege, on the other hand, can be defeated in most jurisdictions by a showing that the publisher acted for the sole purpose of harming the person defamed.
Here the record establishes beyond any reasonable dispute that Deputy Fire Chief Slaughter had a duty to investigate fires. The statement concerning the lie detector test thus concerned a matter within the scope of his official responsibilities and therefore cannot be any question that the communication was qualifiedly privileged.
Once the existence of the privilege was established, the burden was on plaintiffs "to prove its abuse by excessive publication, either by the use of the occasion for an improper purpose, or by lack of belief or grounds of belief in the truth of what was said." See Sokolay v. Edlin, supra, 65 N.J. Super. at 125; Prosser, supra, § 115 at 792-796. The record does not present a *22 genuine issue of fact in this regard. The publication did not exceed the bounds of the qualified privilege and there was no proof whatsoever on the record that Minerbrook knew or had reasonable grounds to believe that the communication was not truthful. Further, the nature of the statement, when explained by Minerbrook concerning its source, as well as the timing of the statement negate any finding of malice.
Moreover, contrary to the conclusion of the trial court, there was no genuine factual issue as to whether it was Slaughter who in fact made the communication to Minerbrook. Although Minerbrook momentarily confused the name of Eaton with that of Slaughter when questioned as to the source of the statement during his deposition testimony, Minerbrook subsequently explained the error and corrected himself. A fair reading of his entire testimony compels the conclusion that Slaughter was the source of the information, not Eaton. This mere confusion of names does not create a genuine issue of material fact warranting a denial of the summary judgment motion and thus subjecting the Star Ledger and its reporter to a libel trial. In this regard we must not lose sight of the fact that our Supreme Court has encouraged the utilization of the summary judgment procedure in libel cases. See Maressa v. New Jersey Monthly, 89 N.J. 176, 196-198 (1982) cert. den. 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982);[2]Kotlikoff v. The Community News, supra, 89 N.J. at 67-68. Such a procedure "winnows out nonactionable claims, avoids the expenditure of unnecessary legal fees, and discourages frivolous suits." Kotlikoff v. The Community News, supra.
*23 Accordingly, the order denying summary judgment is reversed and judgment is entered in favor of the Star Ledger and Minerbrook.
In view of this decision we need not decide whether the trial court erred in (1) failing to hold that there was an absolute privilege afforded the Star Ledger and Minerbrook and (2) refusing to dismiss the punitive damage claim and the claim asserted by Molnar for damages to his construction company.
NOTES
[1] Improperly pleaded as the Star Ledger.
[2] We recognize that courts should be somewhat more hesitant to grant summary judgment where a defendant's state of mind is in issue. See Maressa v. New Jersey Monthly, supra, 89 N.J. 197 n. 10. Here however, the record is totally devoid of any evidence which could support a finding that the publication was made maliciously by either the Star Ledger or its reporter, Minerbrook. Thus, the issue of whether the Star Ledger or Minerbrook had published a defamatory falsehood with actual malice cannot go to the jury.