716 A.2d 1196 (1998)
315 N.J. Super. 137
James SEDORE and Paul Reynolds, Plaintiffs-Respondents,
v.
The RECORDER PUBLISHING CO., Bernardsville News, Charles Zavalick, and David Polakiewicz, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1998.
Decided September 17, 1998.
*1198 A.F. McGimpsey, Jr., Somerset, for defendants-appellants (McGimpsey & Cafferty, attorneys; Mr. McGimpsey and Arlene M. Turinchak, on the brief).
Robert J. Bennett, Jr., Teaneck, for plaintiffs-respondents (Betsch & Bennett, attorneys; Mr. Bennett, on the brief).
Before Judges KING, KESTIN and CUFF.
*1197 The opinion of the court was delivered by KESTIN, J.A.D.
Defendants appeal from the trial court's order denying their motion for summary judgment dismissal of a defamation action based upon the publication of a news article about the closing of an automobile dealership, Somerset Hills Audi (SHA). A simultaneously entered discovery order granting plaintiffs' cross-motion is also a subject of this appeal. It provides:
Defendant shall provide to counsel for Plaintiffs the name, address and telephone number of each and every subscriber to The Bernardsville News as of August, 1995, for the reasons stated on the record, in open Court, and it is further ordered that Plaintiff shall give Defendant prior notice of the letter to be sent to Defendant's newspaper subscribers.
We reverse and dismiss the complaint.

I
On August 9, 1995, an article on the first page of the Bernardsville News (the News), under the byline of David Polakiewicz, discussed the recent shut-down of SHA, a Bernardsville dealership:
The findings of a police investigation into the closing of the Somerset Hills Audi dealership last month have been forwarded to the Somerset County Prosecutor's Office to determine if any criminal charges are warranted against its owners.
Detective Sgt. Kevin Valentine said Monday police began investigating the circumstances around the July 28 closing of the Morristown Road car dealership after complaints were received from employees that paychecks had bounced.
Valentine said that if the prosecutor's office finds criminal wrongdoing, a further investigation would be conducted. If found to be a civil matter, Valentine said police involvement would end. Former employees of the dealership would then have to pursue legal action themselves to recoup wages due from the owners of the defunct business.
Valentine said the closing occurred due to a financial dispute involving the dealership's owners and Volkswagen Credit Inc. (VCI) of Woodcliff Lake. The owners, he said, were apparently in arrears on payments owed to the credit company.
VCI obtained an order in state Superior Court in early July, Valentine said, which froze the assets of the dealership. The court document lists the owners of Somerset Hills Audi, Inc. as Paul Reynolds, *1199 James Sedore and Mayfair Investments, Inc.
Reynolds and Sedore could not be reached for comment on Tuesday.
The balance of the article gave an account of the alarmed reaction of dealership employees regarding their bounced paychecks, as well as the predicament of customers who had been taken by surprise by the closure of SHA.
The defamation suit was brought by James P. Sedore and Paul Reynolds, Jr. against the News; Polakiewicz, the reporter; The Recorder Publishing Co., publisher of the News; and Charles Zavalick, editor of the News. Plaintiffs contend that the defamation consisted of the false attribution to them of an ownership interest in SHA. They contend further that the News article's use of the phrase "[t]he court document" incorrectly implied that the source of the ownership information was an order obtained by VCI. Plaintiffs maintain they were not owners of SHA, but "victims" like the other employees, because their paychecks also bounced and they lost their jobs. Although plaintiffs acknowledge SHA's wrongdoing was accurately described in the article, they assert that because they were falsely named as owners, the wrongdoing was erroneously attributed to them by implication, injuring their reputations as a result, and causing them damage.
Both Reynolds and Sedore had years of experience working with Audi. When an Audi dealership in Bernardsville, which had previously employed Reynolds, was up for sale in 1994, Reynolds went to David T. Lardier, President of Mayfair Investment Corporation (Mayfair), intending to borrow funds to purchase the dealership. Lardier instead decided to have his corporation buy the dealership, with Reynolds and Sedore to be minority shareholders owning interests of five percent each. Reynolds testified that he and Sedore were useful to Lardier because he "needed automobile experience to get a franchise."
SHA was incorporated on July 26, 1994. On September 12, 1994, a letter was sent to VCI as part of an application for a line of credit for "floor plan" financing of new and used vehicles for the dealership. The letter described Lardier as "dealer principal and president" of SHA; Sedore as Vice President and General Manager; and Reynolds as Vice President. Both Sedore and Reynolds were termed "minority shareholders," each possessing five percent of the corporate shares. The letter indicated that SHA had been capitalized by Lardier alone, and that Sedore and Reynolds "will not contribute to [SHA] financially...."
On October 10, 1994, Lardier's application for the Audi dealership was tentatively granted, primarily conditioned upon the dealership obtaining a $1,500,000 line of credit with VCI. An unsigned draft of the dealership agreement forwarded to Lardier by Audi in December of 1994 contained an addendum specifying that Reynolds and Sedore must "at all times" continue as operating managers, and must each initially own five percent of the capital stock of the dealership, with the right to acquire more shares "on reasonable terms." Sedore confirmed in depositions that Audi's approval of SHA had been contingent upon his and Reynolds's involvement. Yet, he also indicated that Lardier returned the dealership agreement with the names of Reynolds and Sedore removed from it, and that as early as December, at an awards banquet in the Virgin Islands, Sedore informed a highly placed corporate official in Audi of North America that he and Reynolds were being excluded from ownership. According to Sedore, as a result of this conversation Audi informed Lardier again, in a letter sent in late December or early January, that the franchise agreement was contingent upon the inclusion of Reynolds and Sedore. Sedore testified that no actual dealership agreement was ever signed: SHA and Audi "worked on a letter of intent."
In January of 1995, Reynolds and Sedore retained an attorney to help them claim their ownership shares of SHA. The attorney contacted a professional associate of Lardier, requesting copies of certain documents, with the professed purpose of "achiev[ing] immediate finality" with regard to the "proper" documentation of Reynolds's and Sedore's position as minority stockholders. A "special counsel" to SHA responded in a letter dated February 9, 1995, that Reynolds and Sedore *1200 were corporate officers, but not shareholders of SHA, and refused to provide the documentation requested.
Reynolds testified in a deposition that sometime between November, 1994 and May 31, 1995, he had notified his customer base of more than 100 personal customers that he was returning to Bernardsville as a partner in the SHA dealership. Both Reynolds and Sedore spoke with the shop mechanics, as well, and told them that they were both to be part owners of the dealership. The sales/business manager and the assistant sales manager were also told that Reynolds and Sedore were owners along with Lardier.
By July of 1995, VCI had taken legal action against SHA, Mayfair and Lardier because SHA was in arrears on payments owed to VCI for cars that had been sold. VCI was concerned about tracing "$1.75 million in proceeds obtained from [SHA's] sale of more than 50 vehicles `out of trust.'"
On July 28, 1995, the dealership closed. SHA employees' paychecks had already bounced before that date.
On July 31, 1995, a "final judgment and order" was entered against SHA, Mayfair and Lardier upon their default in making a payment of $350,000.00 to VCI's counsel as previously ordered by the court. VCI was awarded possession of the vehicles, parts and inventory of SHA; and SHA, Mayfair and Lardier were forbidden to dispose of any of SHA's assets.
By August 9, 1995, when the News article which is the subject of this suit was published, plaintiffs were in the process of purchasing the dealership's assets from VCI. They claim that the alleged defamatory publication hampered them in this undertaking and otherwise caused them personal and professional harm. They allege further that defendants failed to comply with their request to print a correction of the article and a retraction of the offending portion.

II
A defamatory statement is one that "asserts or implies a statement of fact which is damaging to reputation." Lutz v. Royal Ins. Co., 245 N.J.Super. 480, 492, 586 A.2d 278 (App.Div.1991). See also Restatement (Second) of Torts § 559, at 156 (1977) ("A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."). Whether a statement is defamatory is ordinarily a question of law for the court to determine. Kotlikoff v. The Community News, 89 N.J. 62, 67, 444 A.2d 1086 (1982). See also Cibenko v. Worth Publishers, Inc., 510 F.Supp. 761, 764 (D.N.J. 1981). The jury decides the question only when the trial court determines that "the statement is reasonably susceptible to both a defamatory and a non-defamatory meaning[.]" Molnar v. The Star-Ledger, 193 N.J.Super. 12, 18, 471 A.2d 1209 (App.Div. 1984). The publication as a whole must be considered, with the alleged defamation weighed in context. Cibenko, supra, 510 F.Supp. at 764. The law of defamation must accommodate two conflicting values: the concern for protecting individuals in the "`enjoy[ment of] their reputations unimpaired by false and defamatory attacks,'" Costello v. Ocean County Observer, 136 N.J. 594, 606, 643 A.2d 1012 (1994) (quoting Swede v. Passaic Daily News, 30 N.J. 320, 331, 153 A.2d 36 (1959)), and the often colliding interest of promoting free communication in an open society. Costello, supra, 136 N.J. at 606, 643 A.2d 1012 ("Privileges that restrict recovery for defamation ... are `designed to protect speech in those narrowly defined instances in which the public interest in unrestrained communication outweighs the right of redress.'") (quoting Fees v. Trow, 105 N.J. 330, 336, 521 A.2d 824 (1987)). See also Sisler v. Gannett Co., Inc., 104 N.J. 256, 265, 516 A.2d 1083 (1986) (discussing the court decisions "which attempt to pacify the warring interests of free speech and individual reputation"). The key principle in defamation/free expression cases is the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L. Ed.2d 686, 701 (1964). See also, e.g., Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 409, 655 A.2d 417 *1201 (1995), cert. denied, 516 U.S. 1066, 116 S.Ct. 752, 133 L. Ed.2d 700 (1996); Sisler, supra, 104 N.J. at 266, 516 A.2d 1083.
Under New York Times Co. v. Sullivan, supra, a public official may not recover damages in a defamation suit "relating to his official conduct unless he proves that the statement was made with `actual malice' that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-280, 84 S.Ct. at 725, 11 L. Ed.2d at 706. This standard was extended to apply to public figures in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967).[1]
The United States Supreme Court has been less definitive in addressing the appropriate standard for application to private persons. Those accustomed to the public eye
usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.
[Gertz v. Robert Welch, Inc., 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L. Ed.2d 789, 808 (1974) (citations omitted).]
Public officials are seen to have accepted "the risk of closer public scrutiny" by virtue of seeking public office, ibid., and public figures are regarded to "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. at 345, 94 S.Ct. at 3009, 41 L. Ed.2d at 808. Both "invite attention and comment," having "voluntarily exposed themselves to increased risk of injury from defamatory falsehood[.]" Id. at 345, 94 S.Ct. at 3009-10, 41 L. Ed.2d at 808.
Private individuals, for their part, are considered not only more vulnerable, but more "deserving" of protection. Ibid. Because the actual malice standard imposes a "very heavy burden" on plaintiffs, Turf, supra, 139 N.J. at 424, 655 A.2d at 433 the Gertz court determined that the First Amendment does not require imposing the New York Times v. Sullivan "actual malice" standard on defamation suits brought by private individuals. Thus, with a few caveats, including that presumed or punitive damages may not be recovered without "a showing of knowledge of falsity or reckless disregard for the truth[,]" 418 U.S. at 349, 94 S.Ct. at 3011, 41 L. Ed.2d at 810, Gertz left essentially in state hands the development and application of the law governing defamation in respect of private plaintiffs.
[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.
[418 U.S. at 347, 94 S.Ct. at 3010, 41 L. Ed.2d at 809 (citations omitted).]
In Turf, supra, 139 N.J. 392, 655 A.2d 417, the New Jersey Supreme Court addressed the questions of whether and when to apply the actual malice standard to private individuals. In doing so, the Court was governed by its view expressed in Sisler, supra, 104 N.J. 256, 516 A.2d 1083, that New Jersey's Constitution affords greater protection to free speech than is provided by the Federal Constitution.
[O]ur decisions, pronounced in the benevolent light of New Jersey's constitutional commitment to free speech, have stressed the vigor with which New Jersey fosters and nurtures speech on matters of public concern.
[Id. at 271-72, 516 A.2d 1083.]
However, although acknowledging that prior cases had imposed the actual malice standard where "business activities ... intrinsically implicated important public interests," Turf, supra, 139 N.J. at 411-12, 655 A.2d 417, the Court drew some lines. The Court noted *1202 that sole proprietorships or stores, "like a local `mom and pop' stationery store, shoemaker, tailor, cleaner, or barber," were not public figures and their doings were not matters of public concern. Id. at 412, 655 A.2d 417. The same held true for the lawnmower repair business that was the subject of Turf, see id. at 413, 655 A.2d 417 (noting that such a business usually triggers the negligence standard as distinguished from the actual malice standard). Ordinary businesses and their owners were deemed to be private persons, and the heightened burden of the actual malice standard did not apply to them. Id. at 427-28, 655 A.2d 417. Certain "matters of public concern," however, such as conduct that "would constitute a violation of the Consumer Fraud Act," id. at 427, 655 A.2d 417, as well as activities affecting the health and safety of the citizenry, or involving a highly regulated industry, see id. at 410, 655 A.2d 417 (citing Sisler, supra, 104 N.J. 256, 516 A.2d 1083 and Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125, 516 A.2d 220 (1986)), are sufficient to trigger application of the actual malice standard. Turf, supra, 139 N.J. at 416, 426-27, 655 A.2d 417. The criterion for application of that standard to private persons was succinctly stated:
The public [has] a legitimate interest in any business charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a matter of legitimate public concern. When the media addresses those issues of legitimate and compelling public concern, the actual-malice standard of proof will apply, regardless of the type of business involved.

[Id. at 413, 655 A.2d 417.]

III
According to the trial court, "the central issue in this case" was whether or not plaintiffs are public or private figures. Summary judgment was denied to defendants because "a jury could possibly find that plaintiffs do not satisfy the public figure requirement, thus defendants' privilege defense would be invalid." The judge explained his denial of the defense's summary judgment motion as follows:
Defendants have not presented undisputed evidence that plaintiffs were public figures or that they were limited public figures for the purpose of the article in question. An individual does not become a public figure because of alleged ownership interest in a car dealership or participation in a golf tournament.
In so ruling, the trial court judge, although correct in his understanding of the Turf standards, misapplied prevailing requirements and misconceived the nature of the case. It is not for the jury to rule on public/private figure status, since it is settled that this determination is a question of law for the court. Costello v. Ocean County Observer, 136 N.J. 594, 612, 643 A.2d 1012 (1994); Lawrence v. Bauer Publishing & Printing Ltd., 89 N.J. 451, 462, 446 A.2d 469, cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L. Ed.2d 395 (1982). Moreover, defendants do not contend that plaintiffs are public figures. They have conceded the contrary, both in the trial court and on appeal. The trial court judge ignored that concession. It was clearly erroneous for the trial court to have based its ruling on the need to make that determination. Defendants have premised their positions upon arguably applicable qualified or conditional common law privileges, rather than on the federal/state constitutional privilege. The issues raised by application of the common law privileges were not addressed by the trial court.

IV
The common law has traditionally regarded certain communications privileged in order to accommodate the need of the public for the free flow of information. See Dairy Stores, supra, 104 N.J. at 136, 516 A.2d 220. While certain statements are absolutely privileged, "a qualified or conditional privilege has emerged as one of the prime means for the common law to balance the interests in reputation with the publication of information in the public interest." Id. at 137, 516 A.2d 220 (citing Restatement (Second) of Torts, Conditional Privileges, Scope Note preceding § 593, at 258 (1965)). The common law has been characterized as "an alternative, and potentially more stable, *1203 framework for analyzing statements about matters of public interest[,]" Dairy Stores, supra, 104 N.J. at 139, 516 A.2d 220, in contradistinction to the "`public figure' device[,] an awkward and uncertain method of determining whether statements about corporations or their products are actionable." Id. at 140, 516 A.2d 220.
The Supreme Court has likewise seen the term "malice" to be singularly unhelpful in the discussion of the common law privileges, see id. at 151, 516 A.2d 220 ("it can become a pitfall in the underbrush of the common law"). The Restatement reference to "abuse of privilege" has been stressed instead, see ibid. (referencing Restatement (Second) of Torts § 599 (1965)). The Court has observed:
It is more direct to recognize the legal consequences of the publication of certain statements without recourse to so ambiguous a word with such a checkered past. For example, we need not resort to the term "malice" to state that no one has a license to lie.
[Dairy Stores, supra, 104 N.J. at 151, 516 A.2d 220.]
and has concluded:
Although we discard the label, we adhere to the principle that to overcome a qualified or conditional privilege, a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity.... [T]he critical determination is whether, on balance, the public interest in obtaining information outweighs the individual's right to protect his or her reputation.

[Ibid. (citations omitted).]

A.

The Fair Report Privilege
Historically, republication of a defamatory statement uttered by another was a commission of the tort of defamation a second time on one's own account. Costello, supra, 136 N.J. at 606, 643 A.2d 1012 (newspaper would have to "verify that a statement was spoken, and also that the substance of the statement is true"). See also Medico v. Time, Inc., 643 F.2d 134, 137 (3d Cir.), cert. denied, 454 U.S. 836, 102 S.Ct. 139, 70 L. Ed.2d 116 (1981); Restatement (Second) of Torts § 592A, at 259 (1977) (explaining that the common law imposed strict liability for publication of false and defamatory statement about another).
When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true, a newspaper in these circumstances could avail itself of the truth defense only if the truth of the underlying defamation were established.
[Medico, supra, 643 F.2d at 137 (citations omitted).]
Because the common law rule impinged upon freedom of the press, the fair report privilege developed "[t]o ameliorate the chilling effect on the reporting of newsworthy events" that the republication rule imposed. Ibid. The Restatement defines the privilege as follows:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.
[Restatement (Second) of Torts § 611, at 297 (1977).]
Comment d of § 611 then elaborates on the meaning of the term "official proceedings":
The privilege ... extends to the report of any official proceeding, or any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions. Since the holding of an official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken. The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege.
*1204 Three alternative rationales justify the privilege. The first is based upon an agency theory: a reporter covering an official proceeding serves as an agent for those who could have attended the proceeding to see and hear for themselves. Costello, supra, 136 N.J. at 607, 643 A.2d 1012; Medico, supra, 643 F.2d at 140-41. "A theory of public supervision also informs the fair report privilege." Medico, supra, 643 F.2d at 141. That approach is based on the idea that "those who administer justice should always act under the sense of public responsibility[,]" ibid. (quoting Cowley v. Pulsifer, 137 Mass. 392, 394 (1884) (Holmes, J.)), and that citizens should "monitor the conduct of [their] government." Medico, supra, 643 F.2d at 141. Lastly, and simplest, the fair report privilege serves "the public's interest in learning of important matters." Id. at 142.
In deciding when the privilege applies to insulate the defendant, a court must "determine whether the report is a full, fair, and accurate account of the official proceeding." Costello, supra, 136 N.J. at 607, 643 A.2d 1012. The determination is an objective one. Ibid. The standard consists essentially of two tests which must be applied to the alleged defamatory statement: first accuracy, and then fairness.
Costello, supra, 136 N.J. 594, 643 A.2d 1012, involved a newspaper write-up by a reporter investigating possible police misconduct. In a report on the general issue gleaned from a perusal of court documents, one portion of the article described Costello as having strip-searched and fondled a female arrestee. Costello sued for defamation. The Supreme Court analyzed the news article as neither fair nor accurate. It opined that a "reasonable reader" would have concluded the allegedly molested female was "actively pursuing [a] harassment claim" against Costello, when in fact no complaint had been filed against him. Id. at 608, 643 A.2d 1012. The document from which the reporter obtained his information was an exhibit in a pro se order to show cause which was unsigned and stamped "draft." Id. at 601, 643 A.2d 1012. Although at one point the news article indicated that no complaints had been filed against Costello, id. at 604, 643 A.2d 1012,
a reader who review[ed] the entire article receive[d] conflicting information regarding the status of the matter; the article [was] internally inconsistent, misleading and confusing. The story [gave] the overall impression that litigation against Costello concerning Fesl's claim [was] pending.

[Id. at 609, 643 A.2d 1012.]
The Court also viewed the article as "misleading and unfair" because it omitted "significant facts," ibid., including that a court case pending in connection with the incident involved a different arrestee, a male, and a different police officer. The Court also noted that at the time the article was published, Costello was immune from suit by the female arrestee because the statute of limitations had run. Id. at 603, 609, 643 A.2d 1012. Most significantly, however,
the article, and especially its headline, make Officer Costello the focus of the court proceeding. The emphasis of the article is that Fesl is suing Officer Costello for the violation of her civil rights in strip-searching her and that her allegations were part of the overall investigation into police brutality.... Neither of those allegations is true. Guiliano[ ] ... sought records... regarding Officer Magovern, not Lieutenant Costello. * * * The draft complaint ... was relevant to the pending judicial proceeding only to the extent that it involved Officer Magovern.

[Id. at 609-10, 643 A.2d 1012.]
Consequently, because the Court viewed the news article as "not a `full, fair and accurate' report," id. at 612, 643 A.2d 1012, it ruled that the fair report privilege did not apply and, therefore, "the general fault standards govern[ed,]" i.e., negligence in the case of a private figure plaintiff, and actual malice for a public figure. Ibid. After determining that the plaintiff was a public figure, the Court held that the complaint should be dismissed "[b]ecause [the plaintiff] has not produced `clear and convincing' evidence of actual malice[.]" Id. at 619, 643 A.2d 1012.
*1205 In the instant case, the precise words complained of are the following:
VCI obtained an order in state Superior Court in early July, Valentine said, which froze the assets of the dealership. The court document lists the owners of Somerset Hills Audi, Inc. as Paul Reynolds, James Sedore and Mayfair Investments, Inc.
Plaintiffs contend that this statement is false in two respects: 1) that they, Reynolds and Sedore, were named in the court order as 2) owners of the dealership. In fact, the July 31 court order, itself, named only Mayfair and Lardier in connection with SHA. Although plaintiffs acknowledge that the rest of the article was not inaccurate, they argue that, by implication, all of the malfeasance which was in actuality attributable to Lardier and Mayfair, as owners, would have been attributed by News readers to plaintiffs as well. While the article does not directly mention wrongdoing by plaintiffs, "`[t]he sting of an accusation may be more pervasive when made by insinuation.'" Molnar, supra, 193 N.J.Super. at 18, 471 A.2d 1209 (quoting Lawrence v. Bauer Publishing & Printing Ltd., 176 N.J.Super. 378, 389, 423 A.2d 655 (App.Div.1980), rev'd in part on other grounds and vacated in part on other grounds, 89 N.J. 451, 446 A.2d 469 (1982)).
The Accuracy Prong
Valentine, a detective sergeant at the time of the publication of the alleged defamation, was a principal source of information for the News article. At some point after August 1, 1995, when an SHA employee, Christopher Lewis, filed a complaint with Valentine's office, and August 9, the date of the article, Valentine met with the reporter, Polakiewicz, to discuss the SHA closing. In his deposition testimony, Valentine verified that the August 9 News article was an accurate representation of information he had conveyed. With regard to the identification of the owners of the dealership, the following colloquy ensued:
Q: Can you tell me what you indicated who the owners were according to the information you had?
A: Can I explain this, clarify this?
Q: Sure.
A: I received a complaint from Mr. Lewis, and that they were not being paid by the owners of VCI [sic]. Mr. Lewis had indicated to me when he made his complaint that the owners of VCI [sic] included Mayfair Investment, a gentleman by the name of David Lardier, a Mr. Reynolds and a Mr. Sedore.
He produced for me then a document, a court document that was identified or marked ..., to show part of his complaint. When he made the complaint, he produced this to me also.
Q: This is Mr. Lewis who did this?
A: Mr. Lewis provided me with that. David Polakiewicz had asked me several questions about who the owners of Somerset Hills Audi, Incorporated were, and I indicated to him, based on the complaint that was made to me by Mr. Lewis, it included those people we previously mentioned, Mr. Sedore, Mr. Reynolds, Mayfair and Mr. Lardier.
I remember this very clearly. David asked questions, and I remember at that time I didn't have a lot of firsthand knowledge about who the owners were.
David asked me to provide him with a copy of the court document. I didn't feel that that was appropriate to release that out of my file.
However, it was a public record and something that he could obtain. So I let him look at that. He was asking me questions about that. I let him review that. He reviewed that for a while and took notes while he was writing from that.
With regard to your question on that particular paragraph, I never said that Paul Reynolds or James Sedore were listed in that court document as owners.
However, I did tell him that they were mentioned as owners based on the information provided to me by Mr. Lewis.
On cross-examination, Valentine testified that at the time of his initial meeting with Polakiewicz, he had been aware of an article that had appeared in the News on May 31, *1206 1995, on the subject of a golf tournament to which SHA had donated a car. Valentine recalled that the article indicated Reynolds was an owner of SHA, and that Sedore may also have been mentioned to him in that connection by the person who had been in charge of the golf outing. Valentine also recalled that in a conversation with Polakiewicz on August 14, when there was already some concern about a defamation suit by Reynolds and Sedore,[2] Polakiewicz produced a letter from SHA indicating that Sedore and Reynolds were part-owners of the dealership.
Defendant David Polakiewicz gave a somewhat different version of his contacts with Valentine. He maintained that Valentine would not permit him access to the court documents during the pre-article interview because Valentine apparently thought it was inappropriate to do so. Polakiewicz testified that Valentine essentially made an oral presentation to him and then he, Polakiewicz, asked specific questions of Valentine. The information about the ownership of SHA was given to him during the presentation, with Valentine referring to "the one court document." At the time, Valentine had the file on his desk with several papers spread out in front of him.
Polakiewicz further testified that it was not until after the August 9, 1995 story had already appeared in the News that, upon instruction from the executive editor, he went to the courthouse to review the actual documents in Valentine's file. In going through the file, he came across a letter dated September 12, 1994, from SHA to VCI, mentioning that Reynolds and Sedore were five percent owners.
According to Polakiewicz, when he wrote the August 9 article, his "knowledge" of the ownership interest of Reynolds and Sedore had come from other sources besides Valentine. The May 31 article about the golf tournament had been brought to his attention by its author, editor Charles Zavalick. Zavalick, in turn, testified that Reynolds had told him in May that he was an owner of SHA, before Zavalick wrote the article about the tournament. There was also a source which Polakiewicz declined to name, an employee of SHA, who had identified Sedore and Reynolds as part-owners of the company to the reporter.
As part of the sum of information which the parties allege to have been available to Polakiewicz at the time he wrote the article, former SHA service manager Christopher Lewis asserted in a certification that although he communicated with Valentine on August 1, 1995, he had personal knowledge at that time that Reynolds and Sedore were not SHA owners, and never indicated to Valentine that they were owners.
The basic question is one of law to be determined by the court. Kotlikoff, supra, 89 N.J. at 67, 444 A.2d 1086. In the light of the facts developed, and viewing the evidential materials as is required on summary judgment, "in the light most favorable to the non-moving party," Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540, 666 A.2d 146 (1995), we evaluate the alleged defamatory article as a substantially accurate and fair report of a matter of legitimate public interest. It is, therefore, as a matter of law, not actionable.
The one certain inaccuracy present in the August 9 article is the statement implying that the court order listed Reynolds and Sedore as owners. Manifestly, the court order itself did not contain any such reference; the mention of plaintiffs' ownership interests was in another document in the court's case file, an exhibit to a certification. The News article refers to "an order in state Superior Court" and says: "[t]he court document lists" plaintiffs as the owners of SHA. Any reader would necessarily infer from the context that the court order was the source of information either of Valentine or of the reporter.
This is not an error of sufficient consequence for plaintiffs to prevail on the first prong of the test for abuse of the fair report privilege. The privilege applies even if that which is reported is not "`exact in every immaterial detail.... It is enough that it conveys to the persons who read it a substantially correct account of [the contents of an *1207 official document.]'" Costello, supra, 136 N.J. at 607, 643 A.2d 1012 (quoting Restatement (Second) of Torts § 611 comment f (1976)). See also Medico, supra, 643 F.2d at 138 n. 11 ("The fair report privilege is similar to the truth defense [in defamation cases]. Both make verity the issue, although requiring that a report be fair and accurate may allow the press a somewhat greater margin of error than requiring that its report be true.").
The record discloses that one of the sources for the information which Valentine conveyed to Polakiewicz about the ownership of SHA was a documentaccording to Valentine, the complaint filed by SHA employee Lewis, though Lewis's certification states that he knew at the time that Reynolds and Sedore were not owners of SHA, and never indicated to Valentine that they were. Another source of the information was the file of the court proceeding involving VCI, which Valentine referred to but may not have displayed to Polakiewicz. According to Polakiewicz, after the article had been written, he inspected the court's file which contained a letter referring to Reynolds and Sedore as minority shareholders in SHA. Defendants stress that letter, an exhibit in a certification known to have been filed with the court, which indicates that Reynolds and Sedore were part-owners of SHA. It is not surprising that Polakiewicz, as a reporter, may have had difficulty in distinguishing between a complaint, a letter of intent, a certification, and a court order, although ignorance of this type does not, by itself, serve to annul the reporter's responsibility to write accurately and fairly. See Costello, supra, 136 N.J. at 619, 643 A.2d 1012 ("[J]ournalists are not lawyers by trade. Errors in reports on court proceedings are bound to occur from time to time, and the First Amendment protects those errors as long as they are not recklessly or intentionally made."). In any event, the difference between the article's implication that the ownership information came from the court order, and a more accurate statement, instead, that "a" court document, as opposed to "the" court document, was Valentine's source, is not of sufficient moment, given the free speech values at stake, to defeat defendants' motion for summary judgment.
[N]ewspaper accounts of legislative or other official proceedings must be accorded some degree of liberality. When determining whether an article constitutes "a fair and true" report, the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author. Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.
[Costello, supra, 136 N.J. at 625, 643 A.2d 1012 (O'Hern, J., concurring) (quoting Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 424 N.Y.S.2d 165, 399 N.E.2d 1185, 1187 (1979).)]
But see Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1089 (3d Cir.1988) (report that intentionally excludes obviously exculpatory information is neither fair nor accurate).
Both Valentine and Polakiewicz are in essential agreement that Valentine believed Reynolds and Sedore to be part-owners of SHA, and conveyed that information to the reporter verbally. Whether, additionally, Valentine represented to Polakiewicz that the information was confirmed in a court order, a complaint, or a copy of a letter of intent in an exhibit, is not critical in evaluating the essential accuracy of Polakiewicz's reportage. It is equally inconsequential in the circumstances depicted that the document was referred to in a way which conveyed an impression that it was a court order rather than part of a certification in the court file.
The Fairness Prong
The fairness prong of the test for abuse of the fair report privilege is also satisfied. "Although a reporter is allowed to make factual errors and omissions, the fair report privilege will not protect a story if the errors *1208 and omissions mislead readers." Costello, supra, 136 N.J. at 608, 643 A.2d 1012. Plaintiffs, by their own admission, had themselves told customers and fellow employees that they were part owners of SHA. Thus, despite the subsequent failure of Lardier and Mayfair to comply with alleged promises, it was to be expected that the impression remained with the general publicor such of the public as was interested in the affairs of SHAthat Reynolds and Sedore had an ownership interest. Plaintiffs were certainly aware of the representations which had been made to Audi; and the fact that they hired an attorney to assert their ownership interest demonstrates that they deemed themselves to be owners. Reynolds apparently had no qualms about being held out as an owner as late as May 31, 1995, when the article about the golf tournament appeared.
Thus, plaintiffs cannot be heard to complain if there were sources of information which substantiated to reporter Polakiewicz that plaintiffs were part-owners of SHA. After plaintiffs, themselves, disseminated the reports of their ownership which they now claim are false, and even retained an attorney to assert the "falsity" as against Lardier and Mayfair, it is not possible to regard Polakiewicz's article as the sole, or even the primary, source of any widespread belief that plaintiffs had ownership interests in SHA. If the "falsity" plaintiffs propagated turned up in print at a time when it did not redound to their advantage, that is not a cause for action against these defendants.

B.

The Common Interest Privilege
Closely related, or "analogous," to the fair report privilege is the qualified privilege for a communication made by a public official in connection with that official's duties. Molnar, supra, 193 N.J.Super. at 20, 471 A.2d 1209. The New Jersey cases tend to blend a discussion of this privilege with that of fair report. See, e.g., Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 376-77, 149 A.2d 193 (1959); Molnar, supra, 193 N.J.Super. at 20, 471 A.2d 1209. This "common interest" privilege[3] is traditionally defined in terms derived from Lord Chief Justice Campbell's formulation in an 1855 English case:
A communication made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable.
[Fred H. Cate, Defining California Civil Code Section 47(3): The Resurgence of Self-Governance, 39 Stan. L.Rev. 1201, 1206 n. 38 (1987) (quoting Harrison v. Bush, 5 El. & Bl. (Q.B.) [119 Eng. Rep. 509] (1855)).]
See Coleman, supra, 29 N.J. at 375-76, 149 A.2d 193 (statement "not privileged when the person making it has `full knowledge of its untruthfulness.'") (quoting Lawless v. Muller, 99 N.J.L. 9, 12, 123 A. 104 (Sup.Ct.1923)). See also ibid. ("The fundamental test is the bona fides of the communication. Unless that exists the communication is not privileged.") The common interest privilege is also included among the conditional privileges described in the Restatement:
An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.
[Restatement (Second) of Torts § 596 (1977).]
The applicability of this privilege to the present dispute is, if anything, more immediately apparent than that of the fair report privilege. Molnar, supra, 193 N.J.Super. *1209 12, 471 A.2d 1209, is instructive. At issue there was a statement in a newspaper article to the effect that landlord Molnar, who had just been sentenced to six months in jail for noncompliance with property maintenance regulations, had refused to take a lie detector test in connection with a fire of suspicious origin that had occurred at one of his properties. Later, it emerged the landlord had never been asked to take a lie detector test. Id. at 16-17, 471 A.2d 1209. The statement was based on information obtained from a Deputy Fire Chief. We agreed with the trial court that the statement was defamatory as a matter of law. Id. at 17, 471 A.2d 1209.
We nevertheless held for the defendant newspaper in the defamation action. Our holding rested on "the qualified privilege to report defamatory words or statements uttered by a public official with respect to matters within the scope of his official responsibility[.]" Id. at 20, 471 A.2d 1209. The Deputy Fire Chief, the court explained, had a duty to investigate fires. Id. at 21, 471 A.2d 1209. Although conveying information to the news media might not be a specifically designated duty of the official, the court noted "`it is increasingly recognized that if this communication pertains to matters which are within the scope of an official's responsibilities, such statements should be regarded as being within the "outer perimeter" of the official's "line of duty."'" Id. at 20, 471 A.2d 1209 (quoting Sinderbrand v. Schuster, 170 N.J.Super. 506, 509-10, 406 A.2d 1344 (Law Div.1979) (quoting Barr v. Matteo, 360 U.S. 564, 574-75, 79 S.Ct. 1335, 1341, 3 L. Ed.2d 1434 (1959))).

C.

The Burden of Proof
Once the applicability of a common law privilege has been established, the burden shifts to the plaintiffs to overcome the privilege by demonstrating that the alleged defamatory matter was published with either knowledge of its inaccuracy or with a reckless disregard for its truth or falsity, Dairy Stores, supra, 104 N.J. at 151, 516 A.2d 220, or for an improper purpose, Molnar, supra, 193 N.J.Super. at 21, 471 A.2d 1209. See also Restatement (Second) of Torts § 596, comment a, at 275; § 600 (1977).
Valentine, whose duty it was to take part in an investigation of the shutdown of SHA, made the presentation which was the principal source of the statement complained of in the Polakiewicz article. Plaintiffs base their argument not only on the essential factual inaccuracy conveyed in the article that Reynolds and Sedore were among the owners of SHAbut also on the fact that the published statement indicated that Valentine's attribution of an ownership interest derived from a court order, as opposed to a document in the court's possession. There has been no showing made by plaintiffs of improper purpose. The accuracy/fairness analysis we have conducted with regard to the fair report privilege also indicates there has been no showing that defendants were aware, or should have been aware, at the time the article was published, that Reynolds and Sedore were not owners of SHA.

V
Defendants also assert that N.J.S.A. 2A:43-1 grants them a qualified privilege under the circumstances of this case. The statute extends the fair report privilege to
the publication in any newspaper of official statements issued by police department heads and county prosecutors in investigations in progress or completed by them, and which are accepted in good faith by the publisher of any newspaper[.]

[N.J.S.A. 2A:43-1.]
The defense argues that because Valentine was acting in the role of a subordinate to whom authority was delegated by the Police Chief under N.J.S.A. 40A:14-118c, defendants can claim this privilege in addition to that of fair report and common interest.
The statute is of no avail to defendants. The Supreme Court has limited its application "only to statements issued by the heads of the respective departments, and not by subordinates therein," holding that the purpose of the law was to "centralize responsibility." Rogers v. Courier Post Co., 2 N.J. 393, 403, 66 A.2d 869 (1949).

*1210 VI
The courts of this State have recognized that First Amendment values are compromised by long and costly litigation in defamation cases. See Kotlikoff, supra, 89 N.J. at 67, 444 A.2d 1086 (noting the "real potential for chilling journalistic criticism and comment"); Maressa v. New Jersey Monthly, 89 N.J. 176, 196, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L. Ed.2d 169 (1982) ("[T]he cost of defending a libel action can itself deter free press."). For this reason, summary judgment has been held to be a particularly apt vehicle for disposing of defamation suits, and the Supreme Court has urged trial courts not to hesitate to employ summary judgment to expedite such litigation whenever appropriate. Ibid. See also Costello, supra, 136 N.J. at 605, 643 A.2d 1012 ("Summary judgment is ... an important tool for disposing of nonmeritorious libel lawsuits.").
The trial court judge prefaced his conclusions with an exposition of the summary judgment standard:
[M]otions for summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. R. 4:46-2; Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 110 A.2d 24 (1954). It is the movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact, all inferences of doubt being drawn against the movant and in favor of the opponent. Judson. Determining "whether there exists a `genuine issue' of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995).
This standard, albeit correctly stated, was misapplied based on the faulty assumption that the case turned upon the question whether plaintiffs might be characterized as public figures. The State's common law privileges were not addressed by the trial court. We view the case differently. Plaintiffs' status is not an issue, and defendants are entitled to the conditional benefit of the fair report and common interest privileges. The outcome of the case turns upon whether plaintiffs can discharge their burden of proving abuse of either privilege.
To overcome a qualified privilege, abuse of the privilege must be shown by clear and convincing evidence, Williams v. Bell Tel. Labs., Inc., 132 N.J. 109, 121, 623 A.2d 234 (1993) (common interest privilege), a factor not considered by the trial court judge because of the issue which he saw to be dispositive. See also Turf, supra, 139 N.J. at 423-24, 655 A.2d 417; Erickson v. Marsh & McLennan Co., 117 N.J. 539, 565-66, 569 A.2d 793 (1990) ("[I]mposition of a lesser burden of proof would fail to adequately protect the interests underlying the privilege.").
An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

[R. 4:46-2(c) (emphasis added).]
Brill, supra, 142 N.J. at 534-35, 666 A.2d 146, itself, stresses that the court must take into account the clear and convincing standard of proof required in determining summary judgment motions in defamation suits.
Plaintiffs' brief alleges reckless disregard of the truth on the part of the defendants, and malice was alleged in the original complaint. In oral argument on the summary judgment motion, however, plaintiffs' counsel acknowledged that the evidence did not support a claim of actual malice, and that plaintiffs were asserting negligence instead. As we have already concluded, the record before us discloses that plaintiffs will not be successful in establishing, by a clear and convincing showing, the qualities of acts or omissions that, in the circumstances, would be adequate to overcome the qualified privileges which defendants are entitled to claim. We therefore *1211 hold that defendants must prevail on summary judgment as a matter of law.

VII
In view of our determination that the defamation action must be dismissed, there is no need for us to decide whether the trial court's order for discovery of defendant newspaper's customer list was overly broad. We note only that issuance of a protective order, see R. 4:10-3(g), to preserve the confidentiality of the News's subscription list (whether viewed solely as a general business interest, or whether weighed additionally with free press values which are necessarily implicated) would have been appropriate, especially since plaintiffs had no objection, and in actuality had agreed to abide by such provisions.

VIII
The trial court's order denying defendants' motion for summary judgment is reversed and the complaint is dismissed.
NOTES
[1] A public figure may be an individual who "achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L. Ed.2d 789, 812 (1974). More often however, "an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Ibid. Public figures "assume special prominence in the resolution of public questions." Ibid.
[2] In fact, Valentine himself was concerned about a possible law suit, and had begun to take notes of meetings and conversations because Reynolds had threatened to sue him.
[3] It is termed "the common law common interest privilege" in a recent publication. Fred H. Cate, Defining California Civil Code Section 47(3): The Resurgence of Self-Governance, 39 Stan. L.Rev. 1201, 1204 (1987). The New Jersey cases refer to it in a more circumlocutous fashion. See, e.g., Molnar, supra, 193 N.J.Super. at 20, 471 A.2d 1209 (referring to "[t]he qualified privilege to report defamatory words or statements uttered by a public official with respect to matters within the scope of his official responsibility.").